519 So.2d 1164 (1987)
QUINN-L CORPORATION
v.
Thomas R. ELKINS, et al.
No. 86 CA 0500.
Court of Appeal of Louisiana, First Circuit.
September 8, 1987.
Rehearing Denied December 1, 1987.
Writ Granted February 26, 1988.
*1165 Claude R. Reynaud, Dennis Hauge, Baton Rouge, for Quinn-L Corp.
Thomas R. Elkins, Russell L. Dornier, Baton Rouge, for Thomas R. Elkins, Quinn-L Baton Rouge Partnership.
R. Ryland Percy, III, Gonzales, for Wayne P. Bunch.
Before LOTTINGER, SHORTESS and CARTER, JJ.
CARTER, Judge.
This appeal arises from a suit for liquidation, accounting, and partition of a partnership.

BACKGROUND
In 1974, Wayne P. Bunch (Bunch) conceived the idea of building a luxury apartment complex in Baton Rouge, Louisiana. He purchased a 5.2 acre tract in the 8100 block of Jefferson Highway. On a trip to Houston, Texas, Bunch observed the Oaks of Woodlake, an apartment project built in 1972 and 1973 which embodied his concept of a fine apartment project. Bunch contacted the architect of the Oaks of Woodlake, Ed Langwith, to design a complex of approximately 100 units for the Jefferson Highway property. Bunch and Langwith entered into a contract for architectural services on September 12, 1974. Langwith subsequently visited the site on September 24, 1974, and drew the first draft of the plans shortly thereafter.
Bunch then turned his attention to obtaining financing for his project. In calculating his initial estimate of the cost of his project, Bunch used his knowledge of construction and the costs of the Oaks of Woodlake project to determine that his *1166 project could be constructed for $13.00 to $14.00 per square foot.
On March 11, 1975, Bunch received a commitment from Travelers Insurance Company for permanent financing. On September 29, 1975, Bunch received a commitment for interim financing from First Pennsylvania Bank, which agreed to provide 90% of the interim financing if a local lender could be secured for the remaining 10% and if Bunch would post a $400,000.00 letter of credit to cover potential underbudgeting problems. Bunch subsequently posted the required letter of credit, and American Bank & Trust Company financed 10% of the interim financing.
In mid-November, 1975, Bunch met S. Mark Lovell, president of Quinn-L Corporation (Corporation).[1] On December 1, 1975, the Corporation, through its president Lovell, and Bunch entered into an agreement outlining the division of responsibilities between the parties. Under the terms of the agreement, Bunch, as a general partner and as sole shareholder of Wayne P. Bunch Builders, Inc. (Bunch, Inc.), the contractor of the project, was responsible for construction of the apartment complex. The Corporation, on the other hand, was responsible for syndicating the project and, upon completion of the construction, for managing the project.
Subsequently, the Corporation attempted to quickly syndicate the project before the end of the year to take advantage of certain tax laws then existing. The Corporation contacted Thomas R. Elkins, an attorney specializing in the area of securities, to prepare the partnership agreement and private placement memorandum. In addition, Kenneth A. Duncan prepared a tax opinion in connection with the project. On December 30, 1975, Bunch and the Corporation, as general partners, and various limited partners solicited by Elkins and Duncan entered into a partnership entitled the Quinn-L Baton Rouge Partnership (Partnership),[2] an in commendam partnership.
*1167 The loan for interim financing was closed on April 14, 1976, but construction did not commence until late May, 1976. Various problems, however, developed, and the project encountered difficulties getting off the ground, namely numerous sub-contracts had not been obtained, City-Parish regulations necessitated plan changes, formal plans had not been prepared, and there were no specifications on the project. By mid-June, 1976, it became apparent that Bunch was unable to handle the construction responsibilities of the project alone. On June 17, 1976, the Corporation and Bunch entered into an agreement, relieving Bunch of some of his financial obligations and the day-to-day construction responsibilities, but Bunch remained a general partner and Bunch, Inc. remained contractor on the project.
By late 1976 or early 1977, it became apparent that the project was going to be more expensive to construct than had originally been anticipated.[3] Therefore, as a general partner and as authorized by the articles of partnership, the Corporation began advancing the sums necessary to complete construction and, when the first units were completed in June of 1977, to fund operating expenses. The entire construction was completed in September, 1977, and the complex was 90%-100% occupied shortly thereafter. From time to time, the Corporation funded negative cash flow, and when funds were available, the Corporation began repaying itself for loans and advances made to the Partnership.
In May of 1980, the Corporation was removed as managing general partner and was replaced by Thomas R. Elkins. At the time of the Corporation's removal, the alleged total outstanding indebtedness of the Partnership to the Corporation was $951,247.00. Despite demand, no further payments were made on the debt, and no partnership distributions were made to the Corporation.
On February 17, 1983, the Corporation filed suit for liquidation, accounting and partition of the partnership against the Partnership; its limited partners L.H. Bossier, Inc., Mid State Sand & Gravel Co., Inc., Thomas R. Elkins, Lilly Belle Navarre Arcement, Henry C. Manning, and Larry J. Talbot; and general partner Wayne P. Bunch. In its petition, the Corporation also sought recovery of $939,524.99 in advances and loans made to the partnership and any and all partnership distributions due.
Bunch filed a third-party demand requesting $120,000.00 in fees due him by the Partnership.
Thereafter, Elkins and the Partnership filed a reconventional demand against the Corporation. In their reconventional demand, Elkins and the Partnership alleged that the Corporation is indebted to them for $1,361,000.00, the difference between the actual cost of construction ($3,005,340) and the estimated costs in the private placement memorandum ($1,705,340). Elkins and the Partnership also filed a third-party demand against Bunch and Bunch, Inc. In their third-party demand, Elkins and the Partnership alleged that Bunch breached his fiduciary responsibility and, alternatively, that Bunch, Inc. breached its contract in not completing the construction for a fixed price of $1,600,000.00 and, as a result, is liable to Elkins and the Partnership for all damages and, specifically any damage awarded in the main demand.
A bifurcated hearing on the issue of liquidation was held. Judgment was rendered in favor of the Partnership and against the Corporation, dismissing the Corporation's petition for liquidation with prejudice.[4]
On December 3, 1985, the trial court rendered judgment in favor of the Corporation and against the Partnership for $390,330.00 with interest of 8% from January 1, 1978, until paid (for loans and advances). The trial court also rendered judgment in *1168 favor of the Corporation and against the Partnership for $71,074.00 plus 8% interest from due date for partnership distributions. Bunch was awarded $120,000.00 plus 8% interest from January 1, 1978, for various fees due him by the partnership and $3,553.00 plus 8% interest from due date for partnership distributions. The Corporation was permitted to withdraw from the partnership, and the third-party and reconventional demands of the Partnership were dismissed. Expert witness fees and costs were assessed against the Partnership.
From this judgment, the Corporation and the Partnership appeal.[5] The Corporation assigns the following specifications of error:
1. The District Court erred as a matter of law when it failed to hold defendant, Thomas R. Elkins, General Partner of the Partnership, liable with the Partnership for obligations due Quinn-L Corporation.
2. The Court erred in its calculations of damages due plaintiff, Quinn-L Corporation, in failing to consider actual proof of funds advanced to the Partnership by Quinn-L, summaries thereof, and accounting statements which accurately reflected the balance due Quinn-L Corporation. The Court instead made its own calculation based upon other accounting statements which did not consider the flow of funds between Quinn-L and the Partnership between December of 1975 and May of 1980. This is a clear error by the District Court and can be modified by this Court.
The Partnership assigns its specifications of error as follows:
1. The court erred in finding as a matter of fact that the June, 1976 agreement between Bunch and Lovell, relieving Bunch of construction obligations and placing Lovell in charge of construction, came about as a result of the realization of the "under bid."
2. The court erred in finding that the June, 1976 agreement was a valid, arms-length transaction to protect the interests of the partnership.
3. The court erred in its finding that, at the time of the June, 1976 agreement, Lovell and Bunch thought the project was under bid and that Lovell was acting for the partnership rather than his corporation in entering into the agreement with Bunch.
4. The court erred in finding that the June, 1976 agreement came about due to a threat of foreclosure.
5. The trial court erred in refusing to grant a continuance prior to the trial of the case.
6. The court erred in finding that the June, 1976, agreement had any efficacy whatsoever and could bind the partnership in any way.
7. The court erred in finding that Lovell benefited the partnership by taking over the job.
8. The court erred in finding that Bunch was not bound by the construction contract and could still recover fees although no longer being responsible for overruns.
9. The court erred in finding that this is an excellent project at a cost of $3,338,199 as opposed to a projected cost of roughly $2,000,000.
10. The court erred in finding that $300,000 of unsubstantiated job costs (in cash payments) is a reasonable figure on a project with a fixed price contract of $1,726,000.
11. The court erred in denying the reconventional demand of Quinn-L Baton Rouge Partnership in the sum of $1,361,000.
The issue of the trial court's denial of the Partnership's motion for continuance was not briefed and is, therefore, considered abandoned. Uniform Rules, Courts of Appeal, Rule 2-12.4.

*1169 Liabilities of the Corporation and the Partnership vis-a-vis the other

The Partnership contends that the Corporation breached its fiduciary responsibilities to the Partnership and is, therefore, liable to the Partnership for the construction costs in excess of the amount stated in the private placement memorandum and, alternatively, for various allegedly unsubstantiated job costs. The Partnership further contends that the Corporation was guilty of waste and inefficient management of the construction such as to invalidate its claim for reimbursement for various loans made by the Corporation to the Partnership.
The Corporation contends that the trial judge erred in awarding it only $390,330.00. The Corporation reasons that it is entitled to some $939,524.99 advanced to the Partnership for partnership business for which it has not been reimbursed.
It is well settled in Louisiana that a partnership agreement is a synallagmatic and commutative contract created only by the consent of the parties. Reina v. Hartenstine, 426 So.2d 654 (La.App. 1st Cir. 1982), writ denied, 433 So.2d 153 (La.1983); Corkern v. Corkern, 270 So.2d 209 (La. App. 1st Cir.1972), application for writ withdrawn, 272 So.2d 372 (La.1973). The terms of such contract form the law between the parties. LSA-C.C. art. 1983.
On December 31, 1975, the Corporation, Bunch and the in commendam partners entered into a partnership agreement setting forth the essence of their agreement. The partnership agreement enunciated the purpose of the Partnership in Article 4.01 as follows:
The business to be carried on and conducted by the Partnership shall be the acquisition, construction, ownership and management, except as otherwise provided of that certain apartment rental complex known as Jefferson Oaks Apartments to be constructed in East Baton Rouge Parish, Baton Rouge, Louisiana, at 8100 Jefferson Highway, and to maintain, manage, lease and operate the premises together with personal property, appurtenant thereto or used in conjunction therewith; to furnish services to the tenants or occupants of the premises; to finance by mortgage or otherwise the acquisition, improvement and maintenance of the premises; and to lease or acquire and finance personal or mixed property appurtenant thereto or used in connection therewith. The Partnership may sell, exchange, transfer or otherwise dispose of all or any part of its real estate in the event that the Managing General Partner determines that a disposition is in the best interests of the Partnership. The Partnership may transact any other business related to or incidental to the purposes of the Partnership, including the financing of acquisitions, operations, developments or improvements of immovable property by any customary means of financing in the real estate industry. The Managing General Partner shall have the express power to engage in business transactions with any corporation or person or perform any act in order to effectuate the purposes of the Partnership.
The above quoted language clearly establishes that the partners specifically agreed that the Partnership, through its managing general partner, was to carry out the financing, construction, and management of the partnership project. Equally clear is that the managing general partner was specifically empowered to carry out any business transaction necessary to accomplish the objectives of the Partnership.
Articles 10.01 through 10.06 of the partnership agreement further empowered the managing general partner to do all in its discretion to further the Partnership's purposes, including the financing or selling of the project and the general expenditure of partnership money. Specifically, Article 10.03 of the partnership agreement provides, in pertinent part:
The Managing General Partner may in its sole discretion sell, refinance or mortgage all or any part of any of the Partnership property when and upon such terms as it deems in the best interest of the Partnership.
*1170 This provision specifically empowered the managing general partner to borrow funds when and under whatever circumstances the managing general partner determined was in the best interest of the Partnership.
In addition to giving the managing general partner wide latitude in borrowing funds, the partnership agreement also contemplated the repayment of any loans made, and specifically loans made to the Partnership by one of the partners. Article 7.04 of the partnership agreement provides that:
Any advance of money to the Partnership by any Partner in excess of his respective agreed capital contribution to the Partnership Stock shall not be deemed a capital contribution to the Partnership Stock unless so specified in writing, but shall be a debt due from the Partnership to such Partner, and shall be repaid with interest at such rates and at such times as determined by the Managing General Partners, not to exceed eight (8%) per cent per annum.
Moreover, Articles 9.01(e) and 9.02 specifically contemplated repayment to the managing general partner for any such funds advanced as follows:
9.01 In addition to the distribution of profits, gains and losses as provided in Article Eight hereto, the Partnership shall reimburse the General Partners for direct expenses incurred in the forming of the Partnership and the operation of the Partnership and its assets. Direct expenses shall include:
* * * * * *
(e) Any and all other fees and expenses incurred in connection with the carrying out of the purposes of the Partnership.
9.02 The General Partners shall be indemnified and held harmless, both while serving as General Partners and upon their substitution or removal, by the Partnership solely from Partnership assets from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, arising out of or incidental to the General Partners' management of the Partnership affairs; provided, however, that a General Partner shall not be entitled to indemnification where the claim at issue is based upon:
(a) A matter entirely unrelated to the General Partners' management of the Partnership affairs;
(b) The proven gross negligence or willful misconduct of a General Partner seeking such indemnity;
(c) The proven breach by the General Partner seeking such indemnity of any provisions of these Articles.
Article 8.03 also contemplated repayment of loans made to the Partnership by the general partners, as follows:
Upon a sale or liquidation of all or a part of the Partnership property, in the distribution of cash to the Partners, the distribution to the Partners shall be made in the following order and priorities: (i) to the creditors, in the order of priority as provided by law; (ii) to the General Partners for any loans to the Partnership including funding or negative cash flow; (iii) to the Partners in Commendam, as a group, in proportion to their ownership in Partnership stock for any cumulative preference of cash flow to which they may be entitled; (iv) to the Partners in Commendam in proportion to their ownership of Partnership Stock, the sum of $540,000.00; (v) to the General Partners in proportion to their ownership of Partnership Stock, the sum of $300.00; (vi) 50% to the Partners in Commendam in proportion to their ownership of Partnership Stock, 49% to Quinn-L Corporation and 1% to Wayne P. Bunch.
Clearly, a careful reading of the entire partnership agreement demonstrates that the Corporation as the managing general partner was empowered to: (1) manage the financial loans and repayment of those loans; (2) manage the construction of the apartment complex, which was the partnership project; (3) manage the operation of the project upon completion; and (4) perform any and all business transactions necessary to carry on the business of the Partnership.
*1171 Accompanying these many vested powers, however, were the duties conferred on the managing general partner by the articles of partnership and the laws governing partnerships and in commendam partnerships, LSA-C.C. arts. 2801 et seq., which were incorporated into the articles of partnership as "Exhibit A."
The articles of partnership and LSA-C.C. art. 2809 characterize the relationship between a partner and the partnership and/or the other partners as a fiduciary one. LSA-C.C. art. 2809 provides that:
A partner owes a fiduciary duty to the partnership and to his partners. He may not conduct any activity, for himself or on behalf of a third person, that is contrary to his fiduciary duty and is prejudicial to the partnership. If he does so, he must account to the partnership and to his partners for the resulting profits.
The official comment to this article states that LSA-C.C. art. 2809 prohibits a partner from engaging in activities that are prejudicial to the partnership. The relationship of the partners is fiduciary and imposes upon them the obligation of good faith and fairness in their dealings with one another with respect to the affairs of the partnership. This fiduciary duty continues until the partnership is finally liquidated and places the partner in a similar relationship to the partnership that a director holds to a corporation and its shareholders. LSA-C. C. art. 2809, Comment (b).
Stated another way, the relation of partners is fiduciary in character and imposes on the members of the partnership the obligation of the utmost good faith in their dealings with one another with respect to partnership affairs, of acting for the common benefit of all the partners in all transactions relating to the firm business, and of refraining from taking any advantage of one another by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind. 68 C.J.S. Partnership § 76; Henley v. Haynes, 376 So.2d 1030 (La.App. 1st Cir.1979), writ denied, 377 So.2d 843 (La.1979).
Having determined that the Corporation, as the Partnership's managing general partner, was empowered to borrow money for the Partnership and to use whatever means to further the Partnership's purpose, we must now consider whether the Corporation committed any acts which breached its fiduciary responsibility to the Partnership or to the other partners.
The major areas of controversy regarding alleged breaches of the Corporation's fiduciary responsibility to the Partnership are: (1) the Corporation's taking over the construction activities; and (2) the Corporation's management of the finances of the construction and the Partnership.
In addressing whether the Corporation breached its fiduciary responsibility in taking over construction responsibilities after Bunch and Bunch, Inc. were no longer able to continue construction, the trial judge, in his written reasons, stated:
Quinn-L Corporation was the managing general partner and was responsible for this partnership. The limited partners of course could not participate in the construction being by nature "Limited" partners. But the Court realizes that some of them lived in Baton Rouge, particularly Mr. Elkins who was kind of the leader of the limited partners. Certainly with $540,000 of an investment, it cannot be said that these limited partners stayed away from Jefferson Highway and did not even appear there. It cannot be said that they were residents of other states or other countries, having invested in a project way off in Louisiana. But Mr. Lovell needed to do something because the job was fading and was getting bad, and there was a possibility that down the road a foreclosure seizure by the sheriff and that all of these people lose a considerable amount of money as well as lose the possibility of an excellent apartment project.
As a result Mr. Bunch and Quinn-L Corporation got together and reached an agreement. They agreed that Mr. Bunch's name would be used as a general contractor because of the fact that Quinn-L Corporation was not in the contracting business, were not able to secure construction liability bonds, or other *1172 things, and that it would be much easier to deal with both the governmental authorities and others in the building trade if Mr. Bunch's name was continued to be used. The agreement further stated that Mr. Bunch would no longer participate in the construction, that basically he would not receive anymore fees from the construction part of the project, and that he would be out of it other than his name being used.
Now, the Court is of the opinion that there is no way that any limited partner could reasonably object to this compromise. And that Mr. Lovell, representing his corporation, was being reasonable in making that compromise, and that there was no negligence on his part in doing so. In fact, it benefited all of the partnership by his taking over the job....
Thereafter, Quinn-L Corporation continued with the building of the apartment complex. Apparently, there were certain delays maybe or because an inexperienced contractor was now in charge of the job. There was certainly a lot rain as it was testified to by Mr. Faxon. There were other delays either caused by the parties or by acts of God or whatever, but the project was completed in September of 1977. There had been a few buildings completed prior to that time and there was partial occupancy prior to that time. But I think Mr. Lovell testified that there was full occupancy in the Spring of 1978. This, as we have stated before, is an excellent project and basically there has been full occupancy or close to it up until the present time.
* * * * * *
The defendants take the position that Mr. Bunch's original figure for the project one million, seven hundred thousand plus dollarsthat that figure is a figure which the corporation is stuck with. And that anything that they expended in addition to that, they will have to bear the loss for. The Court is of the opinion that that is an unrealistic approach. That Quinn-L Corporation, the plaintiffs, when Mr. Bunch found out that he could not make it, that they did everything reasonable as the Court has said before. The only problem in this case is to determine any amounts that are due to Quinn-L Corporation. This the Court will have to rely on the principles of law.
The trial judge opined, and the record substantiates, that the Corporation did not breach its fiduciary responsibility to the Partnership or to the other partners in taking over the construction activities. This factual finding is not manifestly erroneous.
The next area of inquiry is whether the Corporation breached its fiduciary responsibilities to the Partnership in its handling of the finances of both the construction activities and the partnership business.
In determining the total cost of the construction project and the reasonableness of such cost, the trial judge found that:
[F]rom the beginning by Mr. Bunch, Mr. Lovell, by everybody that was involved in the project, they became concerned that construction was going to cost more than what they had originally determined it was going to cost. That was the big fear, cost overruns, whatever you want to call it, construction costs higher than the original estimates. Many reasons were advanced for that, but that is basically what happened. The job was going to cost more than what Mr. Bunch originally estimated.
Based upon this finding, the trial judge analyzed the expert testimony, with regard to the cost of construction as follows:
The Court does know from expert testimony in this case that there are figures set forth by Mr. Faxon, by the appraisers on the job, of people that can reconstruct the construction, that these apartments were built for about $23 plus per square footMr. Faxon, $23.58; Mr. Morgan, $23.33all somewhere around that, which the Court will have to accept as a realistic figure. The Court further, will adopt the report of the cost as provided by Laventhal & Horvath which was three million, three hundred and thirty-eight, one hundred and ninety-nine dollars. Mr. Dornier brought out particularly the fact that there was some three hundred *1173 thousand dollars worth of invoices that weren't completely substantiated. However, the Court does realize that on construction jobs that some subs are paid for in cash, for whatever they are paid in cash, but they do require cash. And the Court adopts that figurethree million, three hundred and thirty-eight thousand, one hundred and ninety-nine dollarsfor the cost of the job.
Further, although the Partnership took issue with various expenses, the Partnership failed to establish that any Partnership funds were spent for purposes other than Partnership purposes. Reasonable explanations were provided for most, if not all, questioned expenses. For example, the Partnership took issue with the purchase of more than 102 range hoods and mirrors. However, the explanation given by the Corporation was that several of the hoods had rusted and the mirrors had been damaged in storage and had to be replaced. The evidence supported that the materials and labor charged to the Partnership had, indeed, been incorporated into or expended for the partnership project.
The record clearly reflects that all checks written by the Corporation to the Partnership were deposited into Partnership accounts. Additionally, the Partnership does not dispute that the loans were indeed made to the Partnership by the Corporation. No serious dispute as to the amount of loans by the Corporation existed prior to April, 1980, when the Corporation proposed a condominium conversion to recoup some of the outstanding loans. The presentation of this proposal by the Corporation spurred the first accusations of mismanagement and breach of fiduciary responsibility.
The record reflects that the annual financial statements sent to each in commendam partner evidenced a series of loans by the Corporation to the Partnership. Further, correspondence during and after construction between Elkins and the Corporation discussed the more than $900,000.00 outstanding loan balance. Moreover, the expert testimony of Robert Casey, tax attorney, reflects that the 1985 financial statement prepared by Frank McGee, the accountant retained by the Partnership after Elkins became managing general partner, used a figure of $3.1 million as the value to arrive at a depreciation figure of $1.8 million. Casey testified that the higher the basis, the higher the depreciation and resulting negative capitalization. In the 1980 financial statement, the Partnership had realized a negative capitalization of $1,492,000.00. Casey further testified that from 1976-1984, the Partnership had realized a negative off-set of $694,000.00, primarily because of the loans made by the Corporation to the Partnership. The record also showed that these loans made by the Corporation to the Partnership had been used by the Partnership in preparing its deductions and expenses for federal income tax purposes. After audit by the IRS of these loans, the IRS had allowed these deductions upon finding that these expenses had been made and had resulted in a depreciable asset.
After a thorough review and careful study of all of the evidence of record, we are convinced that the trial judge correctly determined that the Corporation had not breached its fiduciary responsibility to the Partnership.
Having determined that the Corporation did not breach its fiduciary responsibilities in conducting Partnership business, we must next determine the amount owed by the Partnership to the Corporation. LSA-C.C. art. 2811.[6]
In assessing the amount owed by the Partnership to the Corporation, the trial judge calculated the total cost of construction ($3,338,199.00) and subtracted from it the first and second mortgage ($2,235,000.00), the contribution of the limited partners ($540,000.00), and the cash flow already received by the Corporation ($172,869.00). The trial judge then determined that the Corporation was due the difference or $390,330.00.
*1174 We find, however, that the calculation made by the trial judge is incorrect. The testimony and documentary evidence demonstrate that the Corporation made loans to the Partnership for which it has not been reimbursed in excess of $939,524.99. Accordingly, we find that the Corporation is entitled to be reimbursed for loans and advances made to the Partnership in the amount prayed for or $939,524.99.

Liabilities of the Partnership and Bunch and Bunch, Inc. vis-a-vis one another
The Partnership contends that the trial court erred in finding that Bunch, Inc. was not bound by the construction contract and was not responsible to the Partnership for the construction costs in excess of the contract price. The Partnership also contends that the trial court erred in awarding Bunch certain non-construction fees.
A written contract between two parties is the law as to those parties, and the courts are bound to enforce the contract as written. LSA-C.C. art. 1983; Martin v. Lafayette Parish Police Jury, 308 So.2d 309 (La.App. 3rd Cir.1975), writ refused, 310 So.2d 851 (La.1975). Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Kean v. Lemaire, 451 So.2d 151 (La.App. 1st Cir. 1984).
A. Construction contract
The legal consequences of a fixed-price building agreement are that the builder will only recover the fixed price for completion of work, regardless of his actual costs, unless the buyer makes changes in the plans and specifications which increase the final cost. The builder, however, bears the burden of proving both the buyer's authorization for and the cost of any changes made. Allan E. Amundson, Inc. v. Hoppmeyer, 442 So.2d 1254 (La.App. 5th Cir.1983); Roberts v. Rolene Corporation, 415 So.2d 546 (La.App. 1st Cir.1982). The builder who fails to do the work as agreed, or in the manner or time agreed, is liable to the buyer for non-compliance. LSA-C.C. art. 2769;[7]White v. Boutte, 392 So.2d 124 (La.App. 1st Cir.1980), writ denied, 396 So.2d 929 (La.1981).
In the instant case, on April 14, 1976, the Partnership and Bunch, Inc. entered into a written contract for the construction of a 102-unit apartment complex for a fixed price of $1,526,000.00. The contract was later amended to increase the contract price to $1,726,000.00. The contract was signed by S. Mark Lovell, president of the Corporation and the Partnership's managing general partner, and Wayne P. Bunch, president of Bunch, Inc. The work to be performed under the contract was to commence on April 14, 1976, and be completed by May 1, 1977.
In rendering judgment, the trial judge dismissed the Partnership's third-party demand against Bunch, Inc. without setting forth any reasons for the denial of such demand. However, we find that the evidence of record demonstrates that Bunch, Inc. failed to fulfill its obligations under the construction contract and is liable to the Partnership for the damages resulting from its breach.
Under the contract dated April 14, 1976, Bunch, Inc. was obligated to construct the 102-unit apartment complex for $1,726,000.00. This, Bunch, Inc. failed to do. Shortly after construction began, Bunch, Inc. encountered difficulties in performing its construction obligations. By letter dated July 17, 1976, Bunch and the Corporation, through S. Mark Lovell, entered into an agreement which relieved Bunch of specific obligations to the Partnership. The agreement provided, in pertinent part, as follows:
1. You presently have a personal letter of credit in the amount of $44,000.00, with the Travelers (permanent lender of the partnership) securing a committment from Travelers. No later than July 14, *1175 1976, Quinn-L will substitute a letter of credit acceptable to Travelers in lieu of your own.
2. You presently have an obligation to place a letter of credit in the amount of $23,900.00, with the American Bank and Trust Co. of Baton Rouge, on the behalf of the partnership. You are relieved of that obligation upon execution hereof and such will be provided by Quinn-L.
3. You are presently due $11,000.00 by the partnership. This will be paid as fees due you. This sum will be paid to you
$4,000by July 20, 1976. $4,000by August 20, 1976. $3,000by Sept. 20, 1976.
4. In consideration of the above you herewith relinquish and release any and all profit, if any, of the construction contract except fifteen percent (15%) of such. Said profit to be determined only after the permanent loan is funded in the amount of $2,000,000.00. If it is funded for less, no profit will accrue to you. It is further agreed that said profit percentage is given solely for your future efforts and cooperation regarding the completion of construction, and the rental and operation of the property. Failure on your part to provide such relieves the required payment. Such failure must be specified in writing at the first knowledge of such by Quinn-L for this provision to apply.
5. You shall keep in effect all insurance, including workman's compensation, liability policies and general contractors license's as required until construction of the project is complete.
6. You shall not disclose this agreement except to such persons as we have previously agreed upon. For all appearances and intents, you shall serve in the same capacity before this agreement was executed.
The above being the full and total agreement between the parties such is agreed to on the date set out above.
Although the Corporation, in the agreement, relieved Bunch of numerous financial obligations, the June 17, 1976, agreement did not release Bunch, Inc. from its obligations under the April 14, 1976, fixed-price construction contract. Further, no other evidence of record, documentary or testimonial, establishes that Bunch, Inc. was released from that contract.
Therefore, we find that Bunch, Inc. is liable to the Partnership for damages arising from its non-compliance with its contractual obligations in the amount of $939,524.99, the amount for which the Partnership was cast in the main demand.
B. Fees
The private placement memorandum, dated December 15, 1975, and signed by all parties on December 31, 1975, set forth the following with regard to various fees due the general partners, Bunch and the Corporation:
The General Partners will receive no salary from the Partnership. Quinn-L Corporation, the Managing General Partner and Wayne P. Bunch will receive the following fees:

 1. Supervisory, non-construction management fees:
 1975 1976 1977
Quinn-L Corporation $20,000. -0- $20,000.
Wayne P. Bunch $40,000. $30,000. $70,000.
 2. Fees for agreement not to compete;
Quinn-L Corporation $30,000. $30,000. -0-
Wayne P. Bunch $30,000. $30,000. $30,000.
 3. Rent-up fees;
Quinn-L Corporation -0- $30,000. $30,000.
Wayne P. Bunch -0- $20,000. $20,000.

These fees were to be paid in addition to any construction fees.[8]
The evidence establishes that although the private placement memorandum sets forth certain fees to which Bunch is entitled, *1176 the Partnership did not pay Bunch some $120,000.00 in fees. The trial judge determined that Bunch is entitled to those fees. We find no error in this finding.

Liability of Elkins to the Corporation
The Corporation contends that the trial court erred in not holding Thomas R. Elkins liable with the Partnership for monies due the Corporation.
A partnership in commendam, or limited partnership, consists of one or more general partners who have the powers, rights, and obligations of partners, and one or more partners in commendam, or limited partners. LSA-C.C. art. 2837. The limited partner must make a contribution to the partnership of either money, things, or the performance of nonmanagerial services. LSA-C.C. art. 2840. However, a partner in commendam does not have the authority of a general partner to bind the partnership, to participate in the management or administration of the partnership, or to conduct any business with third parties on behalf of the partnership. LSA-C. C. art. 2843; Ray's Appliance and Air Conditioning Service, Inc. v. K & D Enterprises, Inc., 350 So.2d 228 (La.App. 3rd Cir.1977), writ denied, 352 So.2d 1032 (La. 1977). The comment under LSA-C.C. art. 2843 states:
This article continues the basic principle that a partner in commendam may not exercise the same rights and privileges available to a general partner. His role is that of a passive contributor whose powers are generally restricted to the protection of his interest.
However, when a partner in commendam participates in the management or administration of the partnership or conducts any business with third parties on behalf of the partnership, he becomes liable as a general partner for the obligations of the partnership. LSA-C.C. art. 2844.
In the instant case, the record reveals that after the Corporation was removed as managing general partner in 1980, in commendam partner Elkins became the managing general partner of the Partnership, thus subjecting him to the liability of a general partner. Therefore, we find that the trial judge erred in not holding Elkins, as a general partner, liable with the Partnership for obligations of the Partnership.

Conclusion
For the above reasons, the portion of the trial court's judgment awarding the Corporation $390,330.00 with interest of 8% from January 1, 1978, for loans and advances made by the Corporation to the Partnership is amended to $939,524.99 with interest of 8% from January 1, 1978, until paid. The portion of the trial court's judgment denying the Partnership's third-party demand against Bunch, Inc. for breach of the construction contract is reversed. Judgment is rendered in favor of the Partnership and against Bunch, Inc. in the amount of $939,524.99 plus interest thereon from date of demand, March 21, 1984, until paid.[9] Further, the portion of the trial court's judgment refusing to hold Elkins liable with the Partnership for all Partnership liabilities is reversed, and judgment is rendered finding Elkins liable in solido with the Partnership. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed against Bunch, Inc., the Partnership, and Thomas R. Elkins.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
SHORTESS, J., concurs.
NOTES
[1] Quinn-L Corporation is a vertically integrated real estate investment company, which is domiciled in Caddo Parish and is owned by various members of Lovell's family.
[2] The articles of partnership set forth the following contributions to partnership stock and percentages of ownership of both the general and limited partners:

GENERAL PARTNERS: CONTRIBUTION TO PARTNERSHIP STOCK PERCENT OF OWNERSHIP
-----------------------------------------------------------------------------------------------
Quinn-L Corporation $200.00 2%
2920 Knight Street, Suite 100
Shreveport, Louisiana
Wayne P. Bunch $100.00 1%
Baton Rouge, Louisiana
 _______ ______
Total owned by General Partners $300.00 3%
PARTNERS IN COMMENDAM Units Owned
-------------------------------------------------------------------------------------------
Lilly Belle Navarre Arcement $162,000. 29.10% 6
Rt. 2 Box 92
Napoleonville, LA 70390
Henry C. Manning $ 27,000. 4.85% 1
4603 Main Street
Zacharie, LA 70701
Larry J. Talbot $ 27,000. 4.85% 1
Rt. 2 Box C-52
Labadieville, LA 70372
Thomas R. Elkins $ 27,000. 4.85% 1
1331 Pickett Ave.
Baton Rouge, LA 70808
Mid State Sand & Gravel Co., Inc. $135,000. 24.25% 5
P. O. Box 7177
Alexandria, LA 71301
L. H. Bossier, Inc. $162,000. 29.10% 6
P. O. Box 7177
Alexandria, LA 71301
 _______ _____ _____
TOTALS $540,000.00 97% 20

[3] The reasons the project encountered cost overruns are numerous: delays, inclement weather, unbonded subcontractors who could not complete their work, poor original estimates, inflation, etc.
[4] No appeal was taken from the judgment dismissing the petition of the Corporation for liquidation; therefore, that issue is not before us on appeal.
[5] Although we will not address each of the assignments of error individually, the opinion adequately discusses all issues raised.
[6] LSA-C.C. art. 2811 provides:

A partner who acts in good faith for the partnership may be a creditor of the partnership for sums he disburses, obligations he incurs, and losses he sustains thereby.
[7] LSA-C.C. art. 2769 provides:

If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.
[8] The private placement memorandum sets forth the following fee schedule with regard to management and construction fees due the general partners by the Partnership:

In addition to the above fees Quinn-L Corporation d/b/a Quinn-L Management shall receive a management fee of 5% of the gross monthly rentals if occupancy is 90% or less and 6% of the gross monthly rentals if occupancy is greater than 90%.
Wayne P. Bunch, in addition to the fees outlined above shall receive a fee for construction of the Project in the amount of $200,000. In the event all apartment units are not ready for occupancy by December 31, 1976, this fee shall be reduced by $100,000. In the event 40 apartment units are not ready for occupancy by July 1, 1976, such fee shall be reduced by $30,000. In the event that a permanent loan is not funded for a minimum amount of $2,000,000, Mr. Bunch will reimburse the Partnership up to and including the sum of $200,000 for the amount that the permanent funding is less than $2,000,000 and the construction fee stated above shall be reduced accordingly.
[9] See LSA-C.C. art. 2000; Fidelity & Deposit Company of Maryland v. Cloy Construction Company, Inc., 425 So.2d 887 (La.App. 1st Cir. 1983).