632 So.2d 326 (1993)
Mary BOND d/b/a Mary Bond Interiors
v.
Dwight ALLEMAND, Roland Allemand and wife Betty A. Allemand.
No. 93 CA 1441.
Court of Appeal of Louisiana, First Circuit.
December 29, 1993.
Rehearing Denied February 23, 1994.[*]
*327 Robert P. Cuccia, Houma, for plaintiff and appelleeMary Bond d/b/a Mary Bond Interiors.
Joseph L. Waitz, Mary Riviere, Houma, for defendants and appellantsDwight Allemand, Roland Allemand and wife Betty A. Allemand.
Before CARTER, GONZALES and WHIPPLE, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment awarding damages for breach of contract.

BACKGROUND
As a result of an automobile accident, defendant Dwight Allemand was rendered a quadriplegic, requiring round-the-clock nursing care. Dwight received a large settlement from a lawsuit arising out of the automobile accident, and he used some of the proceeds from the settlement to build a home compatible with his physical limitations. The custom-built home was designed to accommodate Dwight's parents, Roland and Betty Allemand, and their other children, who were also to live in the home with Dwight. Laurie Ennis, one of Dwight's nurses, introduced the Allemands to Mary Bond, who operated an interior decorating business known as Mary Bond Interiors, Inc. in Houma, Louisiana.

FACTS
On August 11, 1984, Dwight and his mother entered into a contract with Bond for the interior decorating of the new home. Under the terms of the contract, Bond was to receive $4,000.00 upon the execution of the contract, and all purchases made through Bond would be billed to the Allemands at retail prices, plus taxes, cartage, freight, and installation fees. The contract further stated that all purchases would be submitted to the Allemands for approval before the order was placed, and each order would be subject to a fifty percent deposit and approval signature. In accordance with the agreement, upon execution of the contract, the Allemands advanced Bond the $4,000.00.
*328 For the next few weeks, Bond and Laurie Ennis, who assisted Bond with the decorating services, made plans for decorating the Allemands' house. They conducted several informal and formal presentations with the various members of the Allemand family. Following these presentations and in preparation for a trip to market, Bond presented the Allemands with a list of suggested purchases and the approximate retail price of each item. Betty Allemand then gave Bond a check in the amount of $100,000.00 to acquire these items.
The following day, Bond and Ennis went to market in Dallas where they made various purchases for the Allemands. Sometime after Bond returned from Dallas, the Allemands terminated her services. The Allemands subsequently contracted with another decorator at a cost of approximately $129,000.00.
On May 29, 1985, Bond filed the instant action for breach of contract against defendants, Dwight Allemand, Roland Allemand, and Betty Allemand, seeking damages for her lost fees and commissions. On June 17, 1985, the Allemands filed a reconventional demand, alleging primarily that Bond breached the contract by failing to obtain their approval prior to purchasing certain furnishings and furniture in Dallas.
On July 11, 1991, the trial court[1] rendered judgment in favor of Bond and against the Allemands, awarding Bond breach of contract damages in the amount of $105,251.48, less a credit in favor of the defendants in the amount of $104,000.00,[2] together with legal interest from date of demand. Thereafter, on July 29, 1991, the defendants filed a motion for a new trial. While the motion was pending, the defendants filed a motion for appeal, which was granted. The appellate court, however, dismissed the appeal because the record did not contain any ruling on the motion for new trial. By judgment dated May 19, 1993, the motion for new trial was subsequently denied.[3]
From this adverse judgment, defendants appealed, assigning the following specifications of error:
1. The trial judge erred as a matter of law in ruling in favor of the plaintiff, Mary Bond, failing to find that plaintiff violated the terms of the contract drafted by her and written for her own benefit.
2. The trial judge erred as a matter of law in failing to find that plaintiff, Mary Bond, violated the terms of her contract by breaching the implied obligation of good faith.
3. The trial judge erred in awarding the plaintiff, Mary Bond, $27,461.25 in storage fees because plaintiff failed to properly mitigate her damages.
In her brief to this court, Mary Bond requested an increase in the damages awarded her by the trial court.

BREACH OF CONTRACT
Legal agreements have effect of law upon the parties, and as they bind themselves, parties shall be held to a full performance on obligations flowing therefrom. Quinn-L Corporation v. Elkins, 519 So.2d 1164, 1174 (La.App. 1st Cir.1987), writ dismissed, 520 So.2d 415 (La.1988). A party to a contract has an implied obligation to put forth a good faith effort to fulfill the conditions of the contract. LSA-C.C. art. 1759. See Alliance Financial Services, Inc. v. Cummings, 526 So.2d 324, 327 (La.App. 4th Cir.), writ not considered, 531 So.2d 465 (La. 1988).
The courts are bound to enforce the contract as written. Cooper v. Olinde, 565 So.2d 978, 983 (La.App. 1st Cir.), writ denied, 569 So.2d 966 (La.1990). Words of a *329 contract must be given their generally prevailing meaning. Diefenthal v. Longue Vue Management Corporation, 561 So.2d 44, 51 (La.1990). Any unclear and ambiguous contract term must be interpreted against the party who prepared the contract. Potvin v. Wright's Sound Gallery, Inc., 568 So.2d 623, 626 (La.App. 2nd Cir.1990); Don-Barr-Farms v. Pointe Coupee Farmers Elevator, Inc., 452 So.2d 360, 362 (La.App. 1st Cir. 1984).
The burden of proof in an action for breach of contract is on the party claiming rights under the contract. The existence of the contract and its terms must be proven by a preponderance of the evidence. See Baxter v. Zeringue, 501 So.2d 327, 329 (La.App. 5th Cir.), writ denied, 504 So.2d 879 (La.1987); Phillips v. Insilco Sports Network, Inc., 429 So.2d 447, 449 (La.App. 4th Cir.1983); North American Contracting Corporation v. Gibson, 327 So.2d 444, 449 (La.App. 3rd Cir. 1975), writ denied, 332 So.2d 280 (La.1976); New Orleans Silversmiths, Inc. v. Wormser, 258 So.2d 592, 593 (La.App. 4th Cir.1972); Walters v. Edwards, 212 So.2d 749, 754 (La. App. 1st Cir.1968).
The contract between Bond and the Allemands provided for decorating and furnishing services for the almost twenty rooms in the Allemand home. The contract divided the work into two phases, the planning phase and the implementation phase. The planning phase included the following: (1) selection of colors and coordination; (2) window treatments; (3) floor planning; (4) carpet, tile and other flooring; (5) wall treatments, including wall covering and decorative accents; (6) lighting, including light fixtures and lamps; (7) accessories; and (8) furnishings. The contract stated that the planning phase had to be approved prior to proceeding to the implementation phase. The implementation phase included the following: (1) shopping for all furnishings and fixtures described by the plan; (2) ordering and purchasing the items specified and approved in the plan; (3) assisting in securing any installation services required; and (4) supervising the plan implementation.
The contract provided that Bond would receive $4,000.00 upon the execution of the contract and that purchases made through Bond would be billed to the Allemands at retail prices, plus taxes, cartage, freight, and installation fees. The contract further stated that all purchases would be submitted to the Allemands for approval before the order was placed, and each order would be subject to a fifty percent deposit and approval signature.
In the instant case, the trial court found that Bond satisfied her burden of proving that the Allemands breached the contract and awarded Bond damages for the breach. In reaching this conclusion, the trial court apparently made a factual determination that Bond acted in accordance with the contract terms and, more specifically, that she obtained the Allemands approval prior to making the purchases. On appeal, the Allemands contend that the trial court erred in finding that Bond acted in accordance with the terms of the contract. Therefore, we must review that factual determination.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). To reverse the trial court's determinations, the appellate court must find that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The evidence presented at trial consisted of the testimony of Bond, Dwight Allemand, and various documentary evidence.[4]
Bond testified that in June of 1984, she met with Betty Allemand and Laurie Ennis at Parrot's Restaurant in Houma to discuss the possibility of providing decorating services to the Allemands for their new home. At a later meeting, Bond presented Betty Allemand *330 with photographs depicting some of her prior work. Betty Allemand subsequently contacted Bond to request her services.
Pursuant to Betty Allemand's request, Bond testified that on August 11, 1984, she met with the Allemands at their new home in Bourg, Louisiana. Present at the meeting were Betty Allemand, Dwight Allemand, and a couple of Dwight's friends. A "letter of agreement" concerning Bond's services was read aloud and executed at that time. At the conclusion of the meeting, Betty Allemand presented Bond with a check in the amount of $4,000.00 in accordance with the terms of the contract.
Bond further testified that, in the weeks following the execution of the contract, she and Laurie Ennis worked at the Allemands' house, measuring rooms, walls, and windows, and sketching the floor plan. Bond and Laurie Ennis then conducted several informal presentations with the various members of the Allemand family, discussing things such as colors, fabrics, furniture, wallpaper, carpet, etc. However, the majority of the informal presentations were conducted with Betty Allemand.
Bond further testified that on August 27, 1984, she and Laurie Ennis made the first formal presentation to Dwight and Betty Allemand. The presentation was conducted on a room-by-room basis, using an individual manila folder for the planning of each room. The folders contained decorating ideas, including pictures of furniture, samples of wallpaper, fabrics, carpet, and various color choices. Following the first formal presentation, approximately seven additional informal presentations were conducted with Betty Allemand. Bond acknowledged that every specific detail was not itemized or discussed, but that she had been instructed to acquire things for the house. The only specific prohibitions regarding her purchases concerned dishes, a gun cabinet, and a water bed. Bond testified that Betty Allemand had specifically instructed her to handle the decisions because Betty Allemand wanted to simply walk into the house, and sit down and enjoy it. In fact, Betty Allemand was particularly interested in having the house completely decorated in time for the baby shower for her daughter, which was to take place around Christmas.
On September 4, 1984, Bond made a second formal presentation. Again, Bond reviewed each of the folders, this time adding details about furnishings, floor plans, and furniture placement. Bond then presented to the Allemands a list of items, with approximate retail prices, which were to be purchased by her. The items on the list were divided by room and totaled $97,300.00. The Allemands made no objections regarding the items or prices on the list. When the presentation was concluded, Bond informed the Allemands that she and Laurie Ennis would be leaving for Dallas the following day in order to attend the fall market and that she intended to place orders for many of the items discussed. Betty Allemand then gave Bond a check in the amount of $100,000.00.
Once in Dallas, Bond telephoned Betty Allemand to obtain her approval for the purchase of certain furniture including a dining room table, chairs, and two leather sofas. Bond testified that at the conclusion of the conversation, Betty Allemand approved the purchases. Bond then made various purchases and placed orders for other items.
On September 12, 1984, Bond returned from Dallas. Bond testified that, on the day following her return, she and Laurie Ennis made a presentation to Dwight and Betty Allemand, showing them an array of pictures and describing the items which they had purchased in Dallas. At that time, neither Dwight nor Betty Allemand voiced any objections regarding the purchases.
On September 17, 1984, Betty Allemand contacted Bond, inquiring into the total cost to complete the decorating project. Bond estimated that it would take an additional $100,000.00. Later that day, Betty Allemand again contacted Bond. This time Betty Allemand terminated Bond's services. Thereafter, Bond and Laurie Ennis made several unsuccessful attempts to meet with the Allemands to discuss the reason for the termination.
On September 24, 1984, Bond received a letter from the Allemands' attorney, advising her to cancel all orders which she had placed *331 on behalf of the Allemands. Pursuant to these instructions, Bond attempted to cancel the orders. However, some of the vendors refused to permit her to cancel the orders. The retail cost of the items which could not be canceled totaled $57,755.20, and the retail cost of the items which were canceled was $45,923.19.
From September 24, 1984, through the date of trial, Bond repeatedly requested the Allemands to take possession of the furnishings and furniture (which had been ordered and could not be canceled). These items were placed in climate-controlled storage in New Orleans at a cost of $396.00 per month through September 1, 1989, and the monthly cost thereafter was $273.00 per month.
Dwight Allemand testified that Bond never presented a written plan to them and that he had never seen the folders prior to trial. However, Dwight acknowledged that he did not know whether his mother had seen the folders. Dwight stated that when Bond left for Dallas, he did not know what she was going to purchase and that he never approved any of her purchases. He stated that when Bond telephoned from Dallas, his mother, Betty Allemand, did not approve the purchases. Dwight was aware that his mother had written Bond a check for $100,000.00, but he indicated that he thought the money would be placed in an account so Bond "wouldn't have to keep coming back."
Dwight acknowledged that Bond was not given a price limit for the job. Moreover, Dwight acknowledged that his mother had the most involvement with Bond and the interior decorating of the house. In fact, Betty Allemand had issued both checks to Bond (one for $4,000.00 and the other for $100,000.00) and was the only member of the Allemand family present for each and every presentation Bond made.
After reviewing the record in its entirety, we conclude that the record amply supports the trial court's finding that Bond acted in good faith and in accordance with the terms of the contract. At the presentation on September 4, 1984, Bond submitted her plan to the Allemands in accordance with the "planning phase" of the contract. The Allemands made no objections to any of the plans set forth in the folders, nor did they object to any of the items or prices on the list presented by Bond. Instead, the Allemands presented Bond with a check for $100,000.00, further evidencing their approval of the planning phase. Bond then proceeded to the "implementation phase" of the contract, which included shopping, ordering, and purchasing the items for the Allemands' new home. Once in Dallas, Bond telephoned Betty Allemand to obtain further approval for the purchase of certain furniture, including a dining room table, chairs, and two leather sofas, which was given by Betty Allemand. The record shows that a reasonable factual basis exists for a finding that Bond acted in accordance with the terms of the contract. For these reasons, we conclude that the trial court's finding is not manifestly erroneous.

ADVERSE PRESUMPTION
Betty Allemand did not testify at the trial of the matter. In brief, Bond argues that Betty Allemand's failure to testify on behalf of her son gave rise to the presumption that her testimony would have been adverse to him.
There is a rule in our jurisprudence, based upon the duty litigants owe the courts to assist in elucidating the truth of the controversy, that a party's failure to testify on matters material to his case and peculiarly within his knowledge creates a presumption that his testimony would be damaging to his case. Dunckelman v. T. Baker Smith & Sons, Inc., 447 So.2d 26, 29 (La.App. 1st Cir.1984). See Ruthardt v. Tennant, 252 La. 1041, 215 So.2d 805, 810 (La.1968). However, the defendant is not required to provide a defense if the plaintiff does not meet his burden of proof. Sears, Roebuck & Co. v. Appel, 598 So.2d 582, 583 (La.App. 4th Cir. 1992). Moreover, this court has recognized that the adverse presumption rule is but one factor to weigh in adjudicating the case and may not always be fatal. Dunckelman v. T. Baker Smith & Sons, Inc., 447 So.2d at 29.
In the instant case, the record reveals that Bond satisfied her burden of proving that the Allemands breached the contract. It then became incumbent upon the *332 defendants to provide a defense, and more specifically, that Bond failed to obtain their approval for the purchases. Betty Allemand was clearly in the best position to elucidate whether Bond obtained approval for the purchases, but she did not testify. However, the record does not indicate whether the trial court applied the adverse presumption, but it is clear that the trial court could have applied the presumption in this case and considered it in conjunction with the other factors in reaching the conclusion that Bond was entitled to damages for the Allemands breach of contract.

MITIGATION OF DAMAGES
The Allemands contend that the trial court erred in awarding Bond $27,461.25 in storage fees because she failed to mitigate her damages. Apparently, the Allemands claim that the storage fees were excessive.
However, a review of the record indicates that Bond used reasonable care in undertaking to reduce the loss in this case by placing the furniture in climate-controlled storage. The cost of the storage is supported by the record. Therefore, the assignment of error is without merit.

INSUFFICIENCY OF DAMAGE AWARD
In her brief to this court, Bond alleged that she sustained damages in excess of those awarded by the trial court.
LSA-C.C.P. art. 2133 A provides, in pertinent part, as follows:
An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later.
In the instant case, Bond did not appeal or answer the appeal. An appellate brief or argument contained in an appellate brief does not satisfy the requirements of LSA-C.C.P. art. 2133. Tyler v. Gray Insurance Company, 599 So.2d 428, 430 (La.App. 4th Cir.1992); Mackie v. Crown Zellerbach Corporation, 444 So.2d 166, 167 (La.App. 1st Cir.1983). Therefore, Bond's claim for an additional award for damages is not properly before this court and will not be considered.

CONCLUSION
For the reasons set forth above, the judgment of the trial court is affirmed. Costs of the appeal are assessed against the Allemands.
AFFIRMED.
NOTES
[*] Whipple, J. would grant the application for rehearing on the issue of plaintiff's failure to mitigate damages.
[1] The case was originally tried before Judge Wilmore J. Broussard, Jr., who rendered the judgment on the merits.
[2] This credit represented the initial payment of $4,000.00 given to Bond upon the execution of the contract and the $100,000.00 paid to Bond prior to the Dallas trip.
[3] Apparently, Judge Broussard retired between the rendition of the original judgment and the ruling on the motion for new trial. Therefore, Judge John T. Pettigrew heard the motion for new trial.
[4] Laurie Ennis was not called as a witness at trial because she had been killed as a result of an accidental shooting prior to trial.