CHARLES R. JONES, Judge.
|/The Appellants, B.F. Carvin Construction Company, Inc., and Hartford Fire Insurance Company, seek review of a judgment of the district court awarding the Appellee, Quality Flooring, $115,869.29 in damages for breach of contract, less a credit for $58,879.14 for amounts previously paid. We affirm, finding that the district court did not commit manifest error in determining that B.F. Carvin Construction Company, Inc., and Hartford Fire Insurance Company were responsible for paying Quality Flooring 35% of the value of their subcontract.
This suit arises from a dispute relating to payment and performance under a subcontract agreement between B.F. Carvin Construction Company, Inc., (“Carvin”) and Quality Flooring (“QF”) for work performed at the Florida Housing Development, which is owned and managed by the Housing Authority of New Orleans (“HANO”). HANO hired Carvin as its general contractor for the construction of townhouses for the Florida Housing Development. Carvin subcontracted out the flooring work for the project to QF, which was specifically responsible for the installation of vinyl tile and base, ceramic tile and tub enclosures and flooring, and rubber stair threads and risers in eight buildings at the |2Florida Housing Development.[1] Although the initial contract price was $288,747.00, two (2) change orders increased the final contract price to $322,576.00.
During the contract period, QF admittedly made various errors while working on the flooring at the Florida Housing Development. The problems commenced soon after QF began working at the Florida site in November 2001 and allegedly continued until July of 2002, when Carvin demanded timely performance under the subcontract in the form of completion on work in buildings D-l and D-3. QF was supposed to complete its work in D-l and D-3 before moving on to complete the flooring in buildings D-2 and D-4. Subsequently, in August 2002, Carvin terminated the subcontract with QF because, allegedly, QF neither timely performed its work under the subcontract, nor remediat-ed its defective work. Carvin subsequently hired Jim Owens Carpet to complete the remainder of the flooring work. QF admits that problems did arise while working for Carvin, namely leaving grout on the walls in bathrooms, and staining bathroom fixtures with muriatic acid. Nevertheless, QF maintains that it promptly rectified these errors at its own expense.
QF later filed suit against Carvin, its surety Hartford Fire Insurance Company (“Hartford”), and HANO for breach of contract. HANO filed a peremptory ex *398 ception of no cause of action, which was granted by the district court with the consent of QF and HANO. In June 2005, Bixco, Inc. — the supplier for QF — filed a petition of intervention seeking money owed on materials purchased for the construction project, and recognition as a judgment creditor.
3A bench trial was held in May 2009. Before commencing trial, the district court addressed two pre-trial matters. First, the district court granted a motion in li-mine filed by QF, and thereby excluded photographs of flooring and ceramic tile work done by QF, which were produced shortly before trial. Said evidence was subsequently proffered during trial. Secondly, a stipulation was entered into recognizing Bixco as a judgment creditor of QF, and as holding a privilege on any sums recovered by QF.
At trial, the district court denied the claim of QF for general damages, but awarded it damages under the subcontract less previously paid amounts. Based upon testimony introduced at trial, the district court awarded QF 35% of the total cost of the contract because that was the percentage of work the district court determined had been completed by QF under the subcontract. The district court held that Car-vin and Hartford were liable to QF for breach of contract under the subcontract agreement, and awarded QF $115,869.29, subject to a credit in the amount of $62,074.50, for amounts paid to QF by Carvin as set forth in the petition, and for legal interest from date of demand and costs.
Subsequently, Carvin and Hartford filed a motion for new trial, which was denied by the district court. QF filed a motion to clarify received payments, which resulted in the district court rendering an Amended Judgment wherein it reduced the amount of the $62,074.50 credit — given to Carvin and Hartford — to $58,879.14. Carvin and Hartford timely filed for and were granted suspensive appeals from the final judgment, as amended.
Carvin and Hartford raise three issues on appeal:
1. the district court erred in holding them liable to QF under a subcontract agreement when the contract was properly terminated because of the defective workmanship of QF;
|42. the district court erred in awarding QF payment in full for amounts invoiced under the subcontract; and
3. the district court erred in failing to apply the unambiguous terms and conditions of the subcontract, and in determining that the evidence of the losses of Carvin and Hartford sustained as a result of the default of QF to be “inconclusive”.
The Supreme Court of Louisiana has held that the appellate standard of review of factual determinations of the district court is the manifest error standard. In Rando v. Anco Insulations Inc., 2008-1163, p. 29 (La.5/22/09), 16 So.3d 1065, 1087 (citing Cenac v. Public Access Water Rights Ass’n, 2002-2660 (La.6/27/03), 851 So.2d 1006, 1023), the Supreme Court explained:
[t]he standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. The reviewing court should affirm the district court where the district court judgment is not clearly wrong or manifestly erroneous.
*399 The burden of proof in an action for breach of contract is on the party claiming rights under the contract. Rebouche v. Harvey, 2000-2327, p. 3 (La.App. 4 Cir. 12/19/01) 805 So.2d 332, 334 (citing Vignette Publications, Inc. v. Harborview Enterprises, Inc., 2000-1711 (La.App. 4 Cir. 9/12/01), 799 So.2d 531, 2001 WL 1243664; Phillips v. Insilco Sports Network, Inc., 429 So.2d 447, 449 (La.App. 4 Cir.1983). The existence of the contract and its terms must be proved by a preponderance of the evidence. Id., citing Bond v. Allemand, 632 So.2d 326 (La.App. 1 Cir.1993).
We note that although Carvin and Hartford raise three issues on appeal, the district court had to have determined that QF proved by a preponderance of the | ¿evidence that Carvin breached the terms of the subcontract. On appeal, Carvin and Hartford do not argue that the district court erred in finding that QF carried its burden of proof by a preponderance of the evidence. In order for this court to reverse the judgment of the district court, we would have to find that the district court erred-under a manifest error standard of review — in ruling in favor of QF.
Section 20.2 of the subcontract provides that the Contractor, Carvin, had the right to terminate the contract in the event that QF refused or for any reason failed “diligently to prosecute or complete the Subcontract Work or any part thereof’. Section 20.2 further provides that Carvin has the right to “relet the remaining Subcontract Work to others”, or Carvin itself could perform all or any part of the remaining work of QF. Section 20.3 of the subcontract states that “[u]pon termination of the Subcontract in whole or part by the Contractor, the Subcontractor shall not be entitled to receive any further payments on this Project or any other Project until the Subcontract Work had been fully completed and finally accepted by the Contractor ...” Additionally, Section 20.3 provides that QF — as the subcontractor — would be liable for all expenses of completing the subcontracted work, “including all performance costs of whatever nature plus reasonable allowances for overhead and profit and including all other damages, losses, expenses and costs, including attorney’s fees incurred by” Carvin as a result of any termination of the subcontract.
In the first issue raised by Car-vin and Hartford, they argue that the district court erred in holding them liable to QF under a subcontract agreement when the contract was properly terminated because of the defective workmanship of QF. They further argue that the work of QF was defective. Specifically, the work of QF in buildings D-l and D-3 was allegedly substandard with regard to the following:
| r,l ■ Ceramic installation — There were labor issues as well as poor workmanship and poor supervision problems.
2. Grout work — While tile was being laid, grout dried covering freshly laid tile. To remove the grout, undiluted muriatic acid was used by laborers. The finish on several bathroom fixtures was burned by the muriatic acid during the grout-removing process. Furthermore, the muriatic acid also stained the grout itself.
3. Stairs — QF failed to sand stair threads prior to varnishing them.
4. Vinyl Tile — There were several rooms in the D-l and D-3 buildings where vinyl tile was incorrectly laid because the tile was not centered in the rooms.
Carvin hired Jim Owens Flooring to finish the work that QF was contracted to complete at the Florida Housing Develop *400 ment. At trial, the district court relied on two persons who testified regarding the work that QF performed and the work that Jim Owens completed: 1.) Chris Leone, who was the project manager for Carvin at the time of the project; and 2.) William L. Bath, Jr., the project manager for Jim Owens Flooring during the time of the project. Both testified about the scope of the work performed for Carvin.
Mr. Leone was the estimator and project manager for Carvin at the time of the incident. He testified that he went to the Florida Housing Development about twice a week during the construction project, and that corrective work had to be done for some of the work of QF. He further testified that Jim Owens Flooring and Car-vin itself performed some of the corrective work. He also testified that QF did perform some corrective work as well. However, Mr. Leone testified that Jim Owens Flooring performed most of the corrective work.
Prior to seeing photographs proffered by Carvin, Mr. Leone testified that the substandard work that he saw consisted of incomplete tile work, bad grout joints, |7tile not being laid up to base boards, and stair treads were not finished correctly. Mr. Leone could not remember much about the defects of the work of QF on his own. A large portion of the testimony of Mr. Leone was taken while he had the benefit of looking at pictures that were proffered by Carvin.[2]
The testimony of Mr. Bath, the project manager for Jim Owens Flooring who oversaw the Florida Housing project work, contradicts portions of the testimony of Mr. Leone. Mr. Bath testified that there was not work for Jim Owens to correct at the Florida Housing Development. He testified that Jim Owens’ contract with Carvin set forth that that Jim Owens was to do carpet, VC tile, vinyl base, floor patch, and ceramic tile. During his testimony, Mr. Bath read from the contract the scope of the work that Jim Owens Flooring was to perform. Mr. Bath read into the record the following:
Furnish and deliver all labor, material, and equipment necessary to complete all flooring, vinyl tile, and base in buildings D-2 and D-4, C-l, C-2-, C-3 and C-4, and all the ceramic work in buildings C-1, 2, 3, 4 as per plans and specifications, and addendas complete, included but not limited to all adhesive, grout, setting beds, cleanup, patching of floors, floor protection, stair base, transition strips, and other items necessary to complete the part of the job.
Furthermore, Mr. Bath testified that the contract did not call for Jim Owens to work in buildings D-l and D-3, and he could not recall whether any change orders were in existence that might have called for work in those buildings. He | testified that Jim Owens did not do any ceramic work in any of the four D buildings. He also testified that he did not recall Jim Owens doing any corrective work in any of the “D” buildings where QF had worked.
The district court was presented with conflicting evidence on whether corrective work was performed by Jim Owens Flooring. Mr. Leone testified that Jim Owens performed the majority of the work to correct the errors of QF; however, Mr. Bath testified that he did not recall Jim Owens having to do any corrective work. *401 Moreover, pursuant to the contract between Jim Owens and Carvin, and the testimony of Mr. Bath, it does not appear that Jim Owens did any ceramic work in any of the D buildings. Also, buildings D-1 and D-3 were two buildings that Mr. Leone specifically identified as being in need of work to correct substandard varnishing. Nevertheless, these buildings are totally excluded from Jim Owens’ contract with Carvin, and Mr. Bath had no recollection of any work being done in those buildings.
At trial, the district court considered the testimony of both witnesses and found that Carvin and Hartford had not proven that the work of QF was sufficiently defective to justify terminating the contract. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review even though the appellate court may feel that its own evaluations and inferences are more reasonable. Stobart v. State, through DOTD, 617 So.2d 880, 882 (La.1993); See also Rando v. Anco Insulations Inc., 2008-1168 (La.5/22/09), 16 So.3d 1065 (citing Cenac v. Public Access Water Rights Ass’n, 2002-2660 (La.6/27/03), 851 So.2d 1006, 1023). Therefore, in light of the contradictory evidence presented, we cannot say that the distinct court committed manifest error in determining that Carvin and Hartford did not establish that the work of QF was defective as to justify terminating the subject contract. Furthermore, we cannot hold that the district court erred in determining that QF proved by a preponderance of the evidence that Carvin breached the terms of the subcontract where there is no proof that Jim Owens Flooring had to correct the alleged defective work left by QF at the Florida Housing Development, and where QF admittedly corrected its own work.
This conclusion leads to the third issue raised by Carvin and Hartford, which is that the district court erred in determining that the evidence produced by Carvin and Hartford was “inconclusive” in demonstrating that Carvin incurred expenses to correct the errors allegedly caused by QF.[3] However, we pretermit discussion of this assignment or error having already established that the district court did not commit manifest error in holding that QF carried its burden of proof at trial, and that Carvin was unsuccessful in showing that its replacement subcontractor had to correct the work of QF.
Lastly, we address the final issue raised by QF which is whether the district court erred in awarding QF 35% of the subcontract value to QF for breach of | ^contract. The measure of damages in breach of contract cases is governed by the four corners of the contract. Corbello v. Iowa Prod., 2002-0826, p. 8 (La.2/25/03) 850 So.2d 686, 695. Pursuant to Section 20.5 of the subcontract between QF and Carvin, QF was entitled to recover payment for the portion of work it performed in the event that it was determined that QF was not in default for the termination of the subcontract. The Section provides:
20.5 If, after termination of the Subcontract in whole or in party by the Contractor, it is determined for any reason that Subcontractor was not in default under this Subcontract but that the Subcontractor was not properly terminated for default, the subcontractor, as *402 its sole and exclusive remedy, shall be entitled [to] only the amount due under the Subcontract as if the termination were for no-fault as provided in paragraph 20.4. Regardless of whether the termination is for default or no-fault, the Subcontractor shall, in no event, be entitled to special, consequential or exemplary damages nor to anticipate a profit on account of termination of this Subcontract or the Contractor’s alleged breach of the Subcontract. [Emphasis added.]
In this instance, Carvin terminated the subcontract for what was allegedly poor performance. The finding of the district court that Carvin did breach its agreement with QF triggered the application of the above-referenced section. The award of damages made by the district court is consistent with the subcontract agreement because Section 20.5 provided that the award available to QF for termination of the contract was limited to receiving payment for work actually completed under the contract. The district court applied the terms of the subcontract to this dispute by awarding QF only 35% of the value of the total subcontract because the court deemed only 35% of the work at issue was complete |n under the subcontract. The district court did not award general damages to QF, which is consistent with section 20.5. Thus, the decision of the district court to award QF payment for the work it completed was not in error under the terms of the subcontract.
Furthermore, according to both the Reasons for Judgment and the Amended Reasons for Judgment, the district court hinged its decision to award QF 35% of the subcontract value based upon testimony of the bookkeeper for Carvin, Donna Purcello Carvin. She testified that the final application of QF for payment showed a total contract value of $322,756, and a work completion percentage of 35.92%. In its Reasons for Judgment and the Amended Reasons for Judgment, the district court explained:
[fjinally, Donna Purcello Carvin, Car-vin’s bookkeeper testified plaintiffs final application for payment dated July 25, 2002 showed a total contract value of $322,756.00 with 35.92% of Quality’s work complete. (Plaintiffs Exhibit 26) Therefore, the Court awards $115,869.29 subject to a credit in the amount of $62,074.50 which represents the amount already paid under the Subcontract Agreement.
Ms. Carvin testified regarding the existence of applications for payment that led up to the final payment application. She testified that the prior applications were not paid and that evidences that there was a problem with the applications. However, while a different trier of fact may have found that there was a lower percentage of completed work done by QF based on the testimony adduced at trial, we do not find that the district court erred in determining that 35% of the work that QF was hired to perform was completed. We are unable to conclude that the | ^factual findings of the district court are unreasonable in light of the conflicting testimony.
DECREE
For the reasons set forth above, we affirm the judgment of the district court.
AFFIRMED.

. The eight buildings were buildings D-l to D-4 and buildings C-l to 04.

. A large portion of the testimony of Mr. Leone was taken while he examined photographs that were proffered by Carvin and Hartford. Although Carvin and Hartford argue that we can consider this portion of Mr. Leone's testimony on appeal, we decline to do so finding that it was properly excluded by the district court on the motion in limine of QF.

. In its Reasons for Judgment, the district court held:
The evidence in supporting Carvin’s defense that they incurred expenses to correct plaintiff's work is inconclusive. The documentation offered is unrelated, in large part, to the scope of plaintiff’s work.