**HORNBECK OFFSHORE OPERATORS, LLC**

**v.**

**CROSS GROUP, INC., Cross Rentals, Inc., and Cross Services, Inc.**

**NO. 2016 CA 0174**

Court of Appeal of Louisiana, First Circuit.

October 31, 2016

Alida C. Hainkel, Lauren C. Mastio, New Orleans, LA, Attorneys for Plaintiff-1st Appellant, Hornbeck Offshore Operators, LLC

Adam C. McNeil, B. Franklin Martin, III, Richard A. Aguilar, Mark R. Deethardt, New Orleans, LA, Attorneys for Defendant-Appellee-2nd Appellant, Cross Rentals, Inc.

BEFORE: HIGGINBOTHAM, THERIOT, AND CHUTZ, JJ.

HIGGINBOTHAM, J.

This appeal concerns a dispute involving the commercial lease of a large base-mounted winch that was intended for use aboard a vessel in the Gulf of Mexico. After a two-day bench trial, the district court found that the winch was suitable for the purpose of the lease, and awarded damages pursuant to the defendant's reconventional demand for rental payments, attorney fees, costs, and interest.

## BACKGROUND

The plaintiff, Hornbeck Offshore Operators, LLC ("Hornbeck"), owns and operates a fleet of vessels that provide offshore services in the Gulf of Mexico. As part of the cleanup and remediation efforts related to the tragic Macondo/Deepwater Horizon oil spill incident in 2010, Hornbeck contracted with BP Exploration and Production, Inc. ("BP") to charter a vessel that was capable of lifting 130-ton suction pilings/anchors that were embedded in the muddy gulf seabed. To fulfill the BP charter, Hornbeck leased a Mitsubishi Model 147 single drum winch ("the winch") from the defendant, Cross Rentals, Inc. ("Cross"), a rental business that supplied winches and other heavy equipment for offshore vessels and platforms.[1] The winch was capable of lifting loads weighing up to 300 tons and was to be installed on one of Hornbeck's vessels, the M/V HOS IRON HORSE ("the vessel"). Representatives for Hornbeck and Cross entered into a Master Service Agreement ("MSA") on September 8, 2010. The MSA governed each parties' obligations. Additionally, Hornbeck issued a work order directed to Cross on September 14, 2010. The work order incorporated all of the terms of the MSA and specifically defined the parties' understanding of the lease details for the winch, a control station, a floating sheave, and two winch operators. Pursuant to the work order, rent began to accrue when the winch left Cross's equipment yard, and continued to accrue on a daily basis until the winch was returned to Cross's yard.

Before the winch was transported from Cross's equipment yard to Hornbeck's vessel that was docked at Port Fourchon, Louisiana, the winch passed a visual inspection by Hornbeck's representative, Robert Schenkenberg, and a function test supervised by Cross's project manager, Michael Dean Hall. On September 8, 2010, Cross arranged for the winch to be transported from its yard to Hornbeck's vessel. The vessel had been specifically modified at Hornbeck's expense to accommodate the installation of the winch. Hornbeck accepted delivery of the winch and proceeded to install it on the prepared vessel.

At some point shortly after the winch was delivered and installed on the vessel, Hornbeck hired a third-party inspector, Northshore Crane & Equipment, Inc. ("Northshore Crane"), to inspect and function test the winch. Northshore Crane's visual inspection revealed several cracks in

---

1. Cross Rentals, Inc. is a subsidiary of Cross Group, Inc., which was initially named as a defendant in this lawsuit along with Cross Rentals, Inc. and Cross Services, Inc. The only defendant remaining at the time of trial was Cross Rentals, Inc.

the winch's seal welds, which are basically cap welds that are designed to keep moisture and debris out of the winch and to prevent corrosion. While Cross maintained that the seal weld cracks were purely a cosmetic issue and bore absolutely no significance concerning the winch's structural integrity, performance, or safety, Cross agreed to hire a welding company as a courtesy to Hornbeck in order to repair the cracks as Hornbeck requested.

Following the repair of the cracked seal welds, Hornbeck transmitted BP's mandate to Cross that the winch be tested and certified using the American Society of Mechanical Engineers ("ASME") B30.7 Standard. Prior to September 19, 2010, Hornbeck had not specifically mentioned and Cross had never certified any of its winches to ASME standards. However, Cross agreed to work with Hornbeck to develop and implement a process for performing an offshore load test aboard the vessel so that the winch could be certified according to Hornbeck's charter with BP. Cross's expert engineer, Laird A. Willis, reviewed and approved the certification process, and pursuant to BP's recommendation, Hornbeck identified Standard Crane & Hoist, L.L.C. ("Standard Crane") as an independent third-party ASME inspector.

Standard Crane sent Robert Lee Radcliffe to oversee the ASME certification process for the winch. The certification process included a load test to be performed onboard the vessel while it was offshore in the gulf. During the load test, the winch successfully lifted a 210-ton load, which was well above the 130-ton weight of the suction piling/anchors that needed to be lifted pursuant to the BP charter. Mr. Radcliffe declared that the winch had passed the certification and the vessel was returned to the dock. Mr. Radcliffe left the vessel after the load test, even though the certification procedure called for a second step that involved the unspooling of wire from the winch for another visual inspection.

After the winch's wire was unspooled, more cracks in the seal welds were discovered. Hornbeck promptly requested that Cross repair the second set of cracks. Cross declined to make the repairs, again maintaining that the seal weld cracks were cosmetic in nature and non-structural, that the cracks did not affect the safe operation of the winch, that operation of the winch was safe even without seal welds, and that the cracks in the seal welds would continue to repeat after each load test due to the natural flexing design of the winch when it was loaded.

Mr. Radcliffe was summoned back to the vessel, where he participated in a meeting with a representative from BP, Hornbeck, and InterMoor, a contractor that was responsible for rigging/lifting operations on the vessel. No Cross representative was invited to the meeting, even though Mr. Hall was present on the vessel and had observed the entire testing/certification process. After the meeting, Mr. Radcliffe abruptly disqualified the winch and left the vessel. Standard Crane, through Mr. Radcliffe, later issued a report stating that the winch had failed the load test certification process and was tagged "unsafe for operation." When Cross continued to refuse to repair the second set of seal weld cracks, Hornbeck rejected the winch as defective and demanded that it be removed from the vessel. The winch was transported back to Cross's equipment yard on October 5, 2010, effectively terminating the MSA and related work order.

On January 25, 2011, Hornbeck filed a petition against Cross, seeking $282,214.20 for damages related to expenses it incurred due to Cross's alleged breach of the MSA and work order. Cross filed a reconventional demand against Hornbeck, seek-

ing to collect all of the past-due daily rental payments totaling $260,592.08 for Hornbeck's lease of the winch from September 8, 2010, through October 5, 2010, as well as attorney fees and costs. During a two-day bench trial in February 2015, the district court admitted many exhibits and heard testimony from representatives of Hornbeck and Cross, as well as Cross's engineer, Mr. Willis, who was tendered and accepted as an expert in mechanical engineering with a specialization in large, base-mounted winches. No one, including Mr. Radcliffe, from Standard Crane testified at trial regarding the circumstances surrounding Mr. Radcliffe's rejection of the winch's certification or the issuance of the Standard Crane report that ultimately tagged the winch as unsafe for operation.

After taking the matter under advisement, the district court issued reasons for judgment on April 28, 2015, finding that Cross, not Hornbeck, had carried its burden of proof regarding a breach of contract. The district court found that the winch was "suitable for the purpose for which it was leased" and that Hornbeck's disqualification of the winch was erroneous. The district court specifically found the testimony of the engineer, Mr. Willis, to be extremely persuasive and the Standard Crane report to be less credible and less persuasive. Absent testimony from any Standard Crane representative or Mr. Radcliffe, the district court found Hornbeck liable for failing to perform its obligations under the terms of the MSA, and awarded Cross $260,592.08 for Hornbeck's rental of the winch. After a separate hearing concerning attorney fees and costs, a final judgment was rendered on August 5, 2015, against Hornbeck in the sum of $260,592.08 for past-due rental payments, $126,669.50 for attorney fees, $22,538.08 for costs and expenses, and $44,807.56 for judicial interest.

Hornbeck suspensively appealed the judgment and assigned three errors: (1) the district court legally erred by ignoring the clear terms of the MSA that imposed an obligation on Cross to provide "fit" equipment that was "free from defects;" (2) the district court legally erred by effectively shifting Cross's obligation to promptly repair defects to Hornbeck; and (3) the district court erred in awarding damages to Cross and none to Hornbeck. Cross filed an answer to Hornbeck's appeal in the district court, requesting additional attorney fees incurred by Cross in defending the appeal.

## STANDARD OF REVIEW AND INTERPRETATION OF CONTRACTS

 The burden of proof in an action to recover damages for breach of contract is on the party claiming rights under the contract. **Bond v. Allemand**, 632 So.2d 326, 329 (La. App. 1st Cir. 1993), writ denied, 94–0718 (La. 4/24/94), 637 So.2d 468. The existence of the contract and its terms must be proven by a preponderance of the evidence, either direct or circumstantial. **Sullivan v. City of Baton Rouge**, 2014–0964 (La.App. 1 Cir. 1/27/15), 170 So.3d 186, 202. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not. **Id.**

 When findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings. **Sullivan**, 170 So.3d at 196–197. The rule that questions of credibility are for the trier of fact applies to an evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. **Id.**, 170 So.3d at 197. The factual basis for

an expert opinion determines the credibility of the testimony. **Id.**

▓▓▓ |₇Legal agreements have the effect of law upon the parties, and as they bind themselves, parties shall be held to a full performance on obligations flowing therefrom. **Bond**, 632 So.2d at 328. A party to a contract has an implied obligation to put forth a good faith effort to fulfill the conditions of the contract. La. Civ. Code art. 1759; **Bond**, 632 So.2d at 328. The lease contract itself is the law between the parties; it defines the parties' respective rights and obligations so long as the agreement does not affect the rights of others and is not contrary to the public good. **Carriere v. Bank of Louisiana**, 95–3058 (La. 12/13/96), 702 So.2d 648, 666 (on rehearing). See also La. Civ. Code art. 1983. There is implicit in a lease contract the presumption that one of the causes (or reason) for the contract is that the lessee will be able to use the leased object for its intended purpose. See **ABL Management, Inc. v. Bd. of Sup'rs of Southern University**, 2000–0798 (La. 11/28/00), 773 So.2d 131, 136. See also La. Civ. Code art. 1967 (cause is the reason why a party obligates himself).

▓▓▓ The meaning and intent of the parties to a contract must be sought within the four corners of the agreement as a matter of law, and cannot be explained or contradicted by extrinsic evidence, unless the contract is ambiguous. See **Fleniken v. Entergy Corp.**, 99–3023 (La.App. 1 Cir. 2/16/01), 790 So.2d 64, 73, writs denied, 2001–1269 and 2001–1295 (La. 6/15/01), 793 So.2d 1252 and 1252. Whether a contract is ambiguous is a question of law. Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed, unless manifest error is shown. Thus, a district court's interpretation of a lease contract may be a mixed question of law and fact requiring the evaluation of the agreement and the testimony of the parties to the lease. **Id.**

## DISCUSSION

It is clear from the evidence submitted at the trial of this matter that the important cause that motivated Hornbeck to lease the winch from Cross was to fulfill |₈its charter obligation with BP by outfitting a vessel with a winch that was capable of safely lifting 130-ton suction piling/anchors out of the gulf seabed. Cross was motivated by the rental payments it would receive for providing the winch. The specific services provided by Cross to Hornbeck were outlined in the work order that was governed by the provisions of the MSA. The controversy in this case centers on the interpretation and application of several clauses in the MSA and the work order. It is undisputed that neither the MSA or work order specifically addressed whether the winch was required to pass a certification process.

The MSA specified that Cross "shall provide adequate equipment in good working order and condition" and that Cross warranted that the work "shall be ... free of defects in workmanship and materials, ... performed in a good and workmanlike manner *consistent with applicable industry standards and practices and utilizing sound engineering and/or technical principals* where applicable, ... performed with new, merchantable, and fit materials, and ... in full accordance with [the MSA and work order], and [Hornbeck's] specifications." (Emphasis added.) The MSA further provided that all "defects and deficiencies shall be promptly repaired, replaced, or otherwise corrected by [Cross] to [Hornbeck's] satisfaction without additional cost or risk to [Hornbeck]." Under the special provisions contained in the work order, the parties agreed that "[i]n the event of rental equip-

ment breakdown or failure ... [Cross] will credit [Hornbeck] the equipment rental cost only in the event that said breakdown or failure lasts beyond a continuous (24) hour period." The work order further stipulated that "[r]ental rates will start when the equipment is loaded out for departure from the [Cross] facility ... and will remain in effect until return of the equipment to the [Cross] facility ...." There are no provisions in either the MSA or work order that tie an industry certification with the payment of rent.

|₉It is undisputed that Hornbeck did not make any rental payments to Cross for the winch, even for the days that started with the initial delivery of the winch up to the day the winch failed Standard Crane's certification process. Cross maintains that the winch was not defective when it was delivered to and accepted by Hornbeck and installed on the vessel. Cross argues that the winch was always "fit" for service as evidenced by the successful function testing at Cross's equipment yard and the successful offshore load testing conducted onboard the vessel. Hornbeck contends, however, that it does not owe Cross for any rental payments because Cross breached the MSA and work order by not providing a "fit" winch that was "free of defects and deficiencies" and by failing to promptly repair or replace the defective winch in full accordance with Hornbeck's specifications. Hornbeck argues on appeal that the district court ignored the clear terms of the MSA and the work order when it erroneously awarded rental payment damages to Cross.

In written reasons, the district court found "that the [w]inch was suitable for the purpose for which it was leased and that Hornbeck's rejection of the [w]inch was erroneous." The district court concluded that Hornbeck, and not Cross, was liable for failure to perform its obligation under the terms of the MSA. The district

court further found "the testimony of Mr. Willis extremely persuasive." The district court was "convinced, as testified by Mr. Willis, that the cracks located on the [w]inch were superficial and/or cosmetic and did not affect its structural integrity, operation, or safety." The district court also found the testimony of Cross's project manager, Mr. Hall, who was present for the Standard Crane certification process, "very credible." The district court concluded that the weight of the evidence fell almost entirely in favor of Cross concerning whether the winch was defective, "especially in light of the fact that the Court was unable to ascertain answers concerning the discrepancies in the [Standard Crane] [r]eport or what happened in the meeting |₁₀aboard [the vessel] since Mr. Radcliffe was never subject to cross examination" and no one privy to the onboard meeting testified at trial on behalf of Hornbeck.

The district court's ruling is based on findings of fact that involved credibility determinations and weighing competing views of the evidence. When the district court's findings are based on determinations regarding the credibility of witnesses, including the evaluation of expert testimony, we must give great deference to the district court's findings. See **Sullivan**, 170 So.3d at 197. To reverse the district court's determinations, we must find that a reasonable factual basis does not exist for the findings and that the record establishes that the findings are clearly wrong. **Stobart v. State through Dept. of Transp. and Development**, 617 So.2d 880, 882 (La. 1993).

After a thorough review of the record, and especially considering Mr. Willis's expert opinion testimony that the seal weld cracks were purely cosmetic and posed absolutely no structural problem, and that the winch could safely and easily

lift the BP suction piling/anchors—the purpose for which Hornbeck entered the contractual agreement—we conclude that a reasonable basis exists for the district court's factual findings, which are not clearly wrong. Hornbeck offered no witness who was actually present at the time of the load testing and unspooling of the wire from the winch while onboard the vessel to rebut the testimony of Cross's project manager and expert engineer. Hornbeck offered no expert testimony that the seal weld cracks somehow affected the structural integrity of the winch. A party's failure to testify on matters material to his case and peculiarly within his knowledge creates a presumption that his testimony would be damaging to his case. **Bond,** 632 So.2d at 331. Apparently, the district court applied the presumption in this case and considered it in conjunction with the other factors in reaching the conclusion that Cross was entitled to damages for unpaid rental payments for Hornbeck's breach of contract, and that Hornbeck was not entitled to any damage award because Cross had not breached the MSA.

We further note that a careful reading of the Standard Crane report, which ultimately tagged the winch as unsafe for operation, reveals that the winch was never declared to be "defective," nor was there a breakdown or failure of the winch equipment that was identified. Rather, the report merely questions the structural integrity of the winch by stating that further "[i]nspections of these [cracks in the] welds have to be done to ensure that the structural integrity of the unit is still in tact [sic] and is safe for operation." Without more evidence that the cracks constituted defects or deficiencies that actually affected the safe operation of the winch, we find the record amply supports the district court's finding that the winch was delivered in a good and "fit" working condition, suitable for the purpose for which it was leased.

Additionally, we note that the record does not contain any evidence to show that the lack of an ASME certification is somehow equivalent to a "defect" or a "deficiency" that would trigger Cross's duty to repair the winch. The MSA does not define those terms. Cross's expert witness, Mr. Willis, testified that the ASME certification was not normally used for this type of large-sized winch and instead, a different certification that allows for a flexible stress design in large winches was more appropriate. According to Mr. Willis, an acceptable industry standard would not have involved unspooling the wire after the winch successfully lifted the 210-ton load. Mr. Willis also stated that all of the cracks were located in nonstructural seal welds that did not affect the safe operation of the winch, so in his opinion, there was no valid basis to tag the winch as unsafe. In light of Mr. Willis's unrebutted expert testimony, along with Mr. Hall's testimony that even if repaired, the seal weld cracks would reappear due to the natural flexing of the winch, we find no manifest error in the district court's factual determination that the winch was not defective.

We agree that Cross had no obligation to repair the second set of seal weld cracks because there was no evidence of a breakdown or failure of the winch. Therefore, Cross was entitled to recover the unpaid rental payments from Hornbeck. The district court's factual findings are not manifestly erroneous. Additionally, we find no abuse of discretion or manifest error in the award of $260,592.08 to Cross for unpaid rental payments concerning the winch.[2] Absent an abuse of discretion, an

---

2. Hornbeck does not assign any error to the other awards to Cross for attorney fees, legal costs, expert fees, and interest.

appellate court will not disturb a district court's assessment of damages. **Sullivan,** 170 So.3d at 204.

### ANSWER TO APPEAL

██ Hornbeck was granted a suspensive appeal on August 27, 2015, and the related appeal bond was filed on September 8, 2015. Long before the appeal was lodged in this court on February 11, 2016, Cross filed an answer to the appeal in the district court on September 22, 2015, seeking attorney fees and costs associated with answering and defending Hornbeck's appeal. Hornbeck did not file a motion to dismiss or strike Cross's answer to appeal. Instead, Hornbeck urges in a reply brief that this court should reject Cross's answer to appeal, because the answer should have been filed in this court rather than the district court since the district court was divested of jurisdiction once Hornbeck's appeal was granted. Hornbeck relies upon a third circuit case, **Smoot v. Hernandez,** 2008–1121 (La.App. 3 Cir. 3/4/09), 6 So.3d 352, 361–362.

We have previously addressed this issue, holding that there is no requirement that an answer to appeal be filed in the appellate court when the district court is the only court in which the answer can be filed into the record before the return day and the date the appeal record is lodged. See **Brouillette v. Consolidated Const. Co. of Florida, Inc.,** 411 So.2d 598, 599 (La. App. 1st Cir. 1982). See also **Cooper v. Orleans Parish School Board,** 99–0050 (La. App. 4th Cir. 9/8/99), 742 So.2d 55, 58, writ denied, 99–2886 (La. 12/10/99), 751 So.2d 858; **Palmer v. Benson Toyota Co., Inc.,** 641 So.2d 547, 550 (La. App. 5th Cir. 5/31/94), writ denied, 94–2600 (La. 12/16/94), 648 So.2d 392. The only limitation on the filing of an answer to appeal is that it be filed "not later than fifteen days after the return day or the lodging of the record whichever is later." La. Code Civ. P. art. 2133(A). Furthermore, La. Code

Civ. P. art. 2088(A)(6) states that the district court maintains jurisdiction to "[g]rant an appeal to another party." Since Article 2133(A) states that an answer filed by the appellee "shall be equivalent to an appeal on his part[,]" clearly the district court had not lost jurisdiction to allow the filing of Cross's answer. Nothing in Article 2133(A) requires an appellee to wait until after the lodging of the record at the appellate court or the return date to file an answer to the appeal. When the record was lodged with this court, Cross's answer was lodged as part of that record. Thus, the answer to appeal is properly before us.

██ Generally, an increase in attorney fees should be awarded when a party who was awarded attorney fees in the district court is forced to and successfully defends an appeal. **Aswell v. Division of Admin., State,** 2015–1851 (La.App. 1 Cir. 6/3/16), 196 So.3d 90, 96. Since Cross successfully defended Hornbeck's appeal, we find that an additional award of $2,500.00 in attorney fees for services rendered in connection with this appeal is warranted. The judgment will be amended accordingly.

### CONCLUSION

For the stated reasons, the judgment of the district court is amended to award Cross Rentals, Inc. additional attorney fees of $2,500.00 for this appeal. In all other respects, the district court's judgment is affirmed at Hornbeck Offshore Operators, LLC's costs.

**AMENDED, AND AS AMENDED, AFFIRMED.**