CRAIN, J.
|2In this suit to enforce a construction contract, the defendant appeals the trial court’s denial of a motion to continue the trial, the sustaining of an objection to the use of a deposition at the trial, and the quantum of damages awarded; while the plaintiff appeals the denial of its claim for certain costs incurred by its subcontractor. We affirm the rulings on the motion to continue the trial and the objection to the use of the deposition, amend the award of damages, and affirm the denial of the claim for the subcontractor’s costs.
FACTS AND PROCEDURAL HISTORY
At the conclusion of a public bid process, F.G. Sullivan, Jr., Contractor, and the City of Baton Rouge/Parish of East Baton Rouge (City) entered a contract in March of 2001 for a roadway improvement project on Tiger Bend Road in East Baton Rouge Parish for the sum of $3,997,384.20. The project involved the expansion of approximately one mile of the road from two to four lanes and the installation of an underground storm drainage system, a component of the project that Sullivan subcontracted to RCS Contractors, Inc. Sullivan’s construction schedule estimated that the project would require a total of 260 work days to complete. The project would begin with the installation of the drainage system by RCS, followed by Sullivan’s construction of the two new lanes (Phase 1) and the removal and replacement of the two previously existing lanes (Phase 2).
Prior to advertising the project for bids, the City had the right of way cleared and began the process of securing the removal or relocation of utility lines that might interfere with the project, particularly with the installation of the drainage system. It was mutually understood by all parties that the utility lines would be removed or relocated prior to the commencement of work by Sullivan and RCS, and the City’s construction plans and specifications indicated no utilities in the construction area. The City advised Sullivan and RCS that the removal and | ^relocation of all utilities would be completed by April 1, 2001, and the City thereafter confirmed that construction on the project could commence on April 2, 2001.
RCS began work on the drainage system but soon encountered utility lines that were still located in the right of way. While both parties agree that the removal or relocation of the utilities caused delays *191 in the construction, the date and duration of those delays are the primary points of contention in this litigation. The project was ultimately completed in August of 2003.
The City paid Sullivan the principal contract price, but it refused Sullivan’s request for reimbursement of equipment “idle time” for the days when equipment dedicated to the project could not be used because of the delays resulting from the utilities conflicts. For purposes of this appeal, the parties do not dispute that the contract documents provide for reimbursement to Sullivan of a sum, determined by a formula, for such “standby equipment.” After the City refused Sullivan’s request for idle-time reimbursement, Sullivan filed this suit seeking recovery of those sums along with additional overhead expense resulting from the utilities delays. Sullivan also sought to recover a “claim” by RCS for the subcontractor’s “increased costs and damages” associated with the delays. The City denied any liability and asserted a third-party demand against the State of Louisiana, through the Department of Transportation and Development (DOTD), which was later dismissed on an exception of no cause of action.
Sullivan’s claims against the City proceeded to a three-day bench trial. After taking the matter under advisement, the trial court awarded Sullivan $957,736.37 in damages, which was itemized as $889,045.97 in idle equipment costs and $62,690.40 in overhead, and denied Sullivan’s claim for RCS’s additional costs. A judgment setting forth the trial court’s rulings was signed on November 27, 2013. A subsequent motion for new trial was granted only to make |4a minor change of two cents in the judgment amount, amending the award to $957,736.39, as reflected in an amended judgment signed on March 5,-2014.[2] The City appealed the judgment and asserts that the trial court erred (1) in denying its motion to continue the trial, (2) by sustaining Sullivan’s objection to the use of a deposition at trial, (3) by finding a construction delay of 303 days due to utilities conflicts, and (4) in computing damages using the calculation prepared by Sullivan’s expert. Sullivan also appealed and asserts that the trial court erred in failing to award, as an item of damages to Sullivan, the additional costs incurred by RCS as a result of alleged errors in the City’s contract documents.
DISCUSSION

Denial of Motion to Continue

In its first assignment of error, the City contends that the trial court erred in denying its motion to continue the trial. After two prior continuances at the joint request of the parties and a third continuance at the request of Sullivan, the claims were scheduled for trial beginning on September 3, 2013. On August 27, 2013, about one week prior to trial, the City filed a motion to continue asserting that its expert on the calculation of damages, Michael Daigle, was unavailable due to health reasons and that the City needed additional time to hire another expert. The City did not request the issuance of a witness subpoena for Daigle and offered no docu *192 mentation in support of its motion to continue. The trial court denied the motion.
At the beginning of trial, the City renewed its motion to continue, stating on the record that Daigle informed the City’s counsel about three weeks prior to trial that he was no longer testifying or handling any litigation on the advice of his | gcardiologist. The City had no documentation from the physician confirming this information. The trial court again denied the motion, explaining:
So the court has nothing in writing from a cardiologist or any medical records of Mr. Daigle. The court does not know who the cardiologist is, and for what purpose the cardiologist has told Mr. Daigle he cannot testify. And Mr. Daigle was able to communicate that to defense counsel effectively. As I stated, there is no—I find no reason for this court to grant a continuance based off Mr. Daigle’s word that his cardiologist, has suggested that he should not do this line of work.
The City argues that the trial court, was obligated to grant a continuance under Louisiana Code of Civil Procedure article 1602, which provides:
A continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance.
In order to be entitled to a continuance, the moving party has the burden of showing that he met the requirements set forth in Article 1602. Polkey v. Landworks, Inc., 10-0718 (La.App. 1 Cir. 10/29/10), 68 So.3d 540, 551. To meet his burden, the party must establish either (1) that he exercised due diligence, yet was unsuccessful in obtaining material evidence; or (2) that a material witness absented himself contrary to the arrangement made by the party for the witness to appear. McGregor v. Hospice Care of Louisiana in Baton Rouge, Inc., 08-2029 (La.App. 1 Cir. 8/27/09), 2009 WL 838621, p. 3, writ denied, 09-1232 (La.9/18/09), 17 So.3d 980. A party applying for a continuance, although entitled to a reasonable delay and opportunity to procure his witnesses, must show due diligence. La. Code Civ. Pro. art. 1602, 1960 Official Revision Comment (b); Spencer v. Benny’s Car Wash, LLC, 11-1708 (La.App. 1 Cir. 5/4/12), 2012 WL 1580601, p. 6, writ not considered, 12-1279 (La.9/28/12), 98 So.3d 824, reconsideration denied, 12-1279 (La. 11/9/12), 100 So.3d 826.
| (¾When the conditions of Article 1602 are met, the granting of a continuance is mandatory. Carbo v. City of Slidell, 01-0170 (La.App. 1 Cir. 1/8/03), 844 So.2d 1, 9, writ denied, 03-0392 (La.4/25/03), 842 So.2d 400. The policy behind the mandatory continuance is to insure that a party is not deprived of his day in court or his right to properly present his defense when not due to his own fault or delinquency. See American Motorists Insurance Company v. State, Worker’s Compensation Second Injury Board, 544 So.2d 595, 598 (La.App. 1 Cir. 1989).
The record reflects that Daigle told the City’s counsel three weeks before trial that he would not appear as a witness on advice of his physician. The City did not request a trial subpoena for Daigle before or after that notification, and it presented no medical documentation or other evidence substantiating Daigle’s claim that he was physically Unable to attend trial. Upon the showing made, the City’s failure to take reasonable measures to compel, or *193 at least attempt to compel, the witness’s appearance at the trial, combined with its failure to present any proof that the witness’s health rendered any such measures futile or unnecessary, does not demonstrate sufficient due diligence to invoke the provisions of Article 1602. See Broussard v. Coleman, 479 So.2d 1016, 1018-1019 (La.App. 3 Cir.1985), writ denied, 481 So.2d 1354 (La.1986) (trial court did- not err in refusing to continue the trial or hold the record open based on a witness’s illness where the plaintiffs offered no evidence of the illness.and did not subpoena the witness). This assignment of error has no merit.

Use of Daigle’s Deposition at Trial

The City next asserts that the trial court erred in refusing to permit the introduction of Daigle’s discovery deposition, which the City offered during its case-in-chief, on the grounds that Daigle was unavailable for trial because of his health. In support of that tender, the City proffered an exchange of emails dated August 29, 2013, reflecting an attempt by the City’s counsel to get an affidavit |7from Daigle confirming his condition. Daigle advised that he was out of state and would not be back in Louisiana until after the trial. When questioned by the trial court, counsel did not know why Daigle, a resident of the Mandeville/Covington area, was out of state and “didn’t ask.” Sullivan’s counsel objected to the introduction of the deposition, citing a lack of proof of Daigle’s unavailability, the City’s failure to subpoena Daigle, and the fact that the deposition was taken for discovery purposes. The trial court sustained the objection, finding that the City offered no proof of Daigle’s unavailability.
On appeal the City argues that Daigle’s health condition rendered him unavailable for the trial or, in the alternative, that exceptional circumstances warranted the admission of the deposition. Louisiana Code of Civil Procedure article 1450 provides, in pertinent part, that the deposition of a witness may be used by any party for any purpose if the court finds that “the witness is unavailable ... or [ujpon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.” La.Code Civ. Pro. art. 1450A(3)(a) and (c). The trial court has much discretion under Article 1450 in determining whether to allow the use of deposition testimony at trial, and its decision will not be disturbed on review in the absence of an abuse, of that discretion. Dunning v. Dapco Ventures, L.L.C., 01-2366 (La.App. 1 Cir. 11/8/02), 834 So.2d.448, 455, writ denied, 03-0215 (La.3/28/03), 840 So.2d 576.
Although Article 1450 does not specify when a witness is “unavailable,” Louisiana Code of Evidence article 804 provides, in pertinent part, that a declar-ant is “unavailable as a witness” when he “cannot or will not appear in court and testify,” including when he is “unable to be present or to testify at the hearing because of death or then existing physical or mental illness, infirmity, or other Insufficient cause.” La.Code Evid. art. 804 A(4).[3] The party asserting the admissibility of a deposition under Article 1450 A(3)(a) must show that the witness is unavailable for *194 trial. See Montgomery v. Breaux, 297 So.2d 185, 189 (La.1974).
The determination of whether a witness is unavailable is a preliminary question for the trial court. See La. Code Evid. art. 104 A; State v. Ball, 00-2277 (La.1/25/02), 824 So.2d 1089, 1112, cert. denied, 587 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107; Folse v. Folse, 98-1976 (La.6/29/99), 738 So.2d 1040, 1048-49. The trial court may consider otherwise inadmissible evidence in determining this preliminary factual question. See La.Code Evid. arts. 104 A and 1101 C(l); Folse, 738 So.2d at 1048-49. Such determinations are reviewed for manifest error and will not be overturned, absent an abuse of the trial court’s discretion. Ball, 824 So.2d at 1112; see also Martin v. Francis, 600 So.2d 1382, 1386 (La.App. 1 Cir.), writ denied, 606 So.2d 541 (La.1992) (recognizing that the trial court is vested with broad discretion in determining whether a witness is unavailable within the meaning of Article 1450).
The City’s assertion that Daigle was unavailable for trial rests entirely on Daigle’s statement, reflected in an email proffered by the City, that he was no longer “available for trial testimony on the advice of [his] cardiologist.” The City presented no documentation substantiating Daigle’s claim, nor did the City’s counsel express any personal knowledge of the physician-imposed restrictions based upon communications with Daigle’s physician.[4] While an attorney’s representations of his efforts to locate a witness have been held sufficient to ^establish a witness’s unavailability, see Ball v. Capital City Cornichon Corp., 11-1862 (La.App. 1 Cir. 5/2/12), 2012 WL 1550545, pp. 3-4, writ denied, 12-1448 (La.1/18/13), 107 So.3d 623, counsel’s representations in the present case merely conveyed the witness’s claim that his physician advised him not to attend the trial.
In reviewing the trial court’s determination, this court must be cautious not to re-weigh the evidence or substitute its own factual finding just because it may have decided the matter differently. See Cooper v. Barr 13-1857 (La.App. 1 Cir. 5/2/14), 2014 WL 1778281, p. 2, writ denied, 14-1169 (La.9/19/14), 149 So.3d 245. While the City made some showing of Daigle’s unavailability, great weight is attached to the exercise of a trial court’s discretion, which will not be disturbed on review if reasonable people could differ as to the propriety of the trial court’s action. See J. Caldarera and Company, Inc. v. City of Baton Rouge, 03-0759 (La.App. 1 Cir. 2/23/04), 873 So.2d 728, 730. Based upon the showing made, the trial court was not sufficiently persuaded that Daigle was unavailable for trial. Under these circumstances, we find no manifest error or abuse of discretion in that determination.
On appeal, the City also argues that exceptional circumstances justified the admission of Daigle’s deposition under Article 1450 A(3)(e), because it “was informed only weeks from trial that its damages expert could not attend court on advice from his cardiologist.” The trial court made no determination of whether exceptional circumstances existed in this case because the City did not present this argument when it offered the deposition at the trial. Rule 1-3 of the Uniform Rules of Louisiana Courts of Appeal provides, and our jurisprudence generally establishes, that the courts of appeal will review only issues which were submitted to the *195 trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise. See McLane Southern, Inc. v. Bridges, 13-1819 (La.App. 1 Cir. 11/3/14), 2014 WL 5588893, p. 4.[5] Preter-mitting whether the City properly preserved this issue for appeal, we find no exceptional circumstances that warranted the admission of Daigle’s discovery deposition. For the reasons already provided, the record supports a finding that the City did not exercise due diligence to secure Daigle’s appearance at trial or to substantiate the circumstances preventing his appearance. The “exceptional circumstances” basis for admitting a deposition cannot serve as a substitute for the due diligence required to secure a witness’s attendance at trial or the necessity of establishing his unavailability. The City’s reliance on Article 1450 A(3)(c) in support of the admissibility of Daigle’s deposition is without merit.
The City also argues that Daigle’s deposition was admissible at trial because the parties stipulated that the deposition was “taken for all purposes allowed under Article 1421 et seq. of the Louisiana Code of Civil Procedure in accordance with law.” (Emphasis added.) As indicated, the stipulation that the deposition was taken “for all purposes” is expressly limited to those purposes “allowed under” and “in accordance with” the discovery provisions of the Code of Civil Procedure. Those provisions include Article 1450, which sets forth the limitations and conditions for using a deposition at trial. The stipulation does not purport to waive Article 1450’s requirements and does not reflect an unqualified agreement that the deposition would be admissible at trial.
The two cases cited by the City in support of its argument, Town of Church Point v. Carriere, 463 So.2d 986 (La.App. 3 Cir.1985), and Joseph v. Gibliant, 590 So.2d 841 (La.App. 4 Cir.1991), are distinguishable from the present case. In Town of Church Point, the court found a stipulation ambiguous but upheld the trial court’s admission of an expert’s deposition into evidence because counsel for |nthe objecting party “surely must have understood” that the deposition was for probable use at trial since it was taken by counsel for the party who hired the expert. Town of Church Point, 463 So.2d at 989. The court reasoned that a deposition of one’s own expert “would hardly have been taken for discovery purposes.” Town of Church Point, 463 So.2d at 989. In contrast, Dai-gle’s deposition was taken by Sullivan’s counsel and the City’s attorney did not ask any questions during the deposition. There is no indication that .the parties intended that this discovery deposition would be used by the City at the trial in lieu of Daigle’s live testimony.
In Joseph, a physician indicated to both counsel before and during a three-day trial that he would be available to testify at any time. Joseph, 590 So.2d at 843. When defense counsel called him to come to court on the last day of trial, the physician’s office indicated that he was not available and would not be for the rest of the day. The trial court then called the physician’s office in an unsuccessful effort to secure his attendance. A witness subpoena apparently had been requested but was not personally served. The trial court allowed the introduction of the physician’s *196 deposition, and the court of appeal found no abuse of discretion. Joseph, 590 So.2d at 843. Although the court of appeal quoted a stipulation concerning the use of the deposition, the court primarily based its decision on a finding that the witness “chose to make himself unavailable after assuring counsel of his availability.” Joseph, 590 So.2d at 843. The court further found that opposing counsel “knew the deposition was being taken for perpetuation, he was present, and he participated fully.” Joseph, 590 So.2d at 843. Notably, a subpoena for the witness had apparently been requested. See Joseph, 590 So.2d at 843.
In the present case, Daigle did not assure either party at the outset of trial that he would appear when requested, and he was not subpoenaed. Rather, he |12informed the City three weeks earlier that he would not appear at the trial. Further, there is no suggestion that Sullivan’s counsel thought the discovery deposition of the witness was a perpetuation deposition for use at trial. Neither Town of Church Point nor Joseph support the City’s contention that the parties stipulated to the use of Daigle’s deposition at trial in lieu of his live testimony, and the trial court did not abuse its discretion in refusing to allow Daigle’s deposition into evidence. This assignment of error has no merit.[6]

Calculation of Damages for Idle Equipment and Additional Overhead

The City’s next two assignments of error concern the trial court’s reliance on the opinions of Sullivan’s expert, Michael Myers, in determining the amount of damages awarded to Sullivan. In rendering its ruling, the trial court stated that Myers, who was accepted by the court as an expert in cost consulting and critical path method scheduling, “gave the court some direction or guidance” as to the length of the delay resulting from the utilities conflicts, but the court agreed with the City that some of the days included in the 303-day delay calculated by Myers “should not be counted.” The court expressed difficulty in determining an exact number of days to “pull out ... due to rain, holidays and all of that,” so it used Myers’s calculation of 303 days but discounted Myers’s net damage figures by 11S15%, resulting in an award for idle equipment costs of $889,045.97.[7] The court also awarded $62,690.40 for Sullivan’s separate claim for lost overhead.
In reviewing these assignments of error, we are mindful that when *197 findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Hanks v. Entergy Corporation, 06-477 (La.12/18/06), 944 So.2d 564, 580-81; Lirette, 563 So.2d at 852-53; Hartec Corporation v. GSE Associates, Inc., 10-1332 (La.App. 1 Cir. 2/24/12), 91 So.3d 375, 390, writ denied, 12-0972 (La.6/22/12), 91 So.3d 972. The factual basis for an expert opinion determines the credibility of the testimony. Hudspeth v. Allstate Insurance Company, 13-1288 (La.App. 1 Cir. 7/3/14), 2014 WL 3559373, writ denied, 14-1651 (La.10/31/14), 152 So.3d 157. Where documents or objective evidence so contradict the witness’s testimony, or the testimony is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the testimony, the court of appeal may find manifest error or clear wrongness even where the finding is purportedly based on a credibility determination. Jackson v. Tulane Medical Center Hospital & Clinic, 05-1594 (La.10/17/06), 942 So.2d 509, 513.
We first address the trial court’s award for idle equipment charges. While the City concedes that Sullivan introduced evidence that indicates a delay due to 1 ^utilities conflicts, the City contends that the evidence does not show when the delays occurred. As a consequence, according to the City, Sullivan did not prove what equipment, was at the job site when the actual delays occurred. Having exhaustively reviewed Myers’s opinion., and the basis therefore, we find the City’s position to be correct.
The parties do not dispute that equipment “standby” or “idle” charges are determined pursuant to a directive in the Engineering Directives and Standards Manual issued by DOTD (DOTD directive), which is part of the contract documents and provides in pertinent part:
For standby equipment, the allowed hourly reimbursement rate shall not exceed one-half of the Blue Book monthly rate, divided by 176, and adjusted for region and age. Standby will not be allowed during periods when the equipment would ordinarily be idle, such as on Saturdays, Sundays, holidays, and days when weather conditions prevent the contractor from working, or when breakdowns prevent working, or while being serviced. Standby hours -will not be allowed if the equipment actually worked eight or more hours in the day or forty or more hours for the week.
As indicated, the DOTD directive provides for an hourly reimbursement rate for “standby equipment ... [that] shall not exceed one-half of the Blue Book monthly rate, divided by 176, and adjusted for region and age.” This rate is then multiplied by the number of hours the equipment is idle, which in the present case means the amount of time the equipment sat idle on the site because of utilities conflicts.
Because the reimbursement is available only for equipment rendered idle by a delay, and in this ease a delay specifically resulting from utilities conflicts, the specific date of any such delay is necessary to determine what equipment was on the project at the time of the delay. As expressed by Myers, “If a piece of equipment *198 wasn’t there during that time period, then it wasn’t going to get into any claim.” To establish the dates of the delays, Sullivan did not rely on project documentation identifying when the project was halted because of utilities conflicts. Instead, Sullivan relied on Myers’s opinions to show not only the length | l5of the delays, but, more importantly for the idle equipment claim, when those delays occurred. By comparing Sullivan’s projected construction schedule with the actual construction schedule, Myers surmised that the delays totaled 303 days, which occurred during two consecutive periods, the first consisting of 122 days from March 25, 2002, through July 25, 2002, and the second consisting of 181 days from July 25, 2002, through May 30, 2003.
Myers then used Sullivan’s billing record to identify 105 pieces of equipment, ranging from bulldozers to tracks that were on the job site during those delay periods. He calculated the recoverable equipment costs for each piece of equipment by multiplying its idle days by a daily reimbursement rate, which he derived from a monthly rate in the “Blue Book,” a reference book that is mentioned in the applicable DOTD directive.[8] Cumulatively, Myers calculated gross idle equipment costs of $2,557,274.26, which he then reduced by 50% to arrive at net recoverable idle equipment costs of $1,278,637.13.[9]
After a thorough review of the record and Myers’s testimony, we find no reasonable basis supporting his opinion concerning the critical issue of when the delays occurred. Myers opined that the first delay of 122 days occurred from March 25, 2002, through July 25, 2002, whicli correlated with Sullivan’s completion of the Phase 1 paving work and the start of the base work for the new road in Phase 2. Because Sullivan originally had not projected any delay between those two phases of the project, Myers attributed the 122 day delay to the utilities conflicts. However, there is no evidence in the record, nor did Myers cite any |,(¡information upon which he relied, indicating that the project was actually suspended during that period of time.
Myers acknowledged that the 122 days of delay “didn’t just occur in that period,” meaning March 25, 2002, through July 25, 2002. Rather, the delays “accumulated sporadically over the course of the whole preceding part of the job ... incrementally from the beginning of the job through this July 25th point in time,” but the sum result “was realized as March through July of '02.” A summary of the project work prepared by Myers indicates that during that period of time, Sullivan was working on driveways and sidewalks for Phase 1 and excavation and embankment work for Phase 2. That information is supported by the project work diaries which likewise documented Sullivan’s work on those parts of the job during that time period.
There was also ample evidence of days when construction was suspended by utilities conflicts before March 25, 2002. Reports generated by the City that documented “work days” were offered into evidence and identified 49 such days lost *199 to utilities conflicts on dates occurring well before the commencement of Myers’s first delay period beginning on March 25, 2002. While Sullivan disputes the accuracy of later reports prepared by the City, Sullivan did not dispute that the 49 days identified in the reports were, in fact, lost due to utilities conflicts; however, Myers apparently merged those days into the delay period he identified beginning on March 25, 2002. Similarly, Steve Strickland, Sullivan’s project estimator and construction manager, testified that utilities conflicts began within two weeks of commencement of the drainage work in April of 2001 and persisted thereafter. This testimony was corroborated by testimony from Roland Alonso, president and sole owner of RCS, and letters from Alonso and Sullivan to the City advising of repeated conflicts with utilities on numerous occasions before March 25,2002.
117Pespite this evidence, Myers utilized a delay period that commenced on March 25, 2002, and ran continuously through My 25, 2002, to identify which equipment was idle and for how long as a result of the utilities conflicts. Myers’s calculation, therefore, includes idle equipment charges for any and all equipment that was on the site at any time between March 25, 2002, and July 25, 2002, even though it is undisputed that work was ongoing during that period of time. On the other hand, Myers’s calculation does not. include idle equipment charges for equipment that was on the site during any of the uncontested 49 utilities conflict days, all of which occurred before March 25, 2002.
As to the second delay, Myers began with the actual duration of Phase 2 (309 days) and subtracted its duration as projected by Sullivan (128 days) to arrive at a figure of 181 days. He considered these additional 181 days as days when construction on the project was not possible because of utilities conflicts. Without explanation, Myers concluded that the start date and end date of the second delay coincided with the start date and end date for the entire Phase 2 construction: July 25, 2002, through May 30, 2003. Myers made no effort to identify exactly when the 181 delay days occurred during Phase 2. Instead, he generally attributed the 181 days throughout the entire period and utilized a “factor” of .5858 to determine the length of the idle time for each piece of equipment used on the job during Phase 2. That factor appears to be the proportion of delay days, as determined by Myers, compared to the total number of days actually required to complete Phase 2.
Myers thus assumed that every piece of equipment used in Phase 2 was idle at some point during that phase, and, moreover, that each such item of equipment was idle for the same percentage of time it was on site: 58.58%. That assumption has no factual basis in the record, and Myers did not identify any information that | ishe relied upon to support the application of such a global assumption to each and every piece of equipment used in Phase 2 of the project.
Combining both of his delay periods, Myers assumed that all of the days when construction was suspended due to utilities conflicts occurred during a continuous period of time beginning on March 25, 2002, and ending on May 30, 2003. The record contains no evidence suggesting that construction on the project completely ceased for that period of time due to utilities conflicts or for any other any reason. Myers’s opinion concerning when the construction delays occurred is not based in fact, is internally inconsistent, and is contradicted by documents and objective evidence. Therefore, because Myers’s reasons are patently unsound, the trial court’s *200 reliance on his opinion to determine the amount of the idle equipment charges is owed no deference and was manifestly erroneous. See Hanks, 944 So.2d at 580-81. This warrants a de novo review of the evidence by this court to determine an appropriate amount of damages for the idle equipment charges. See Wooley v. Lucksinger, 09-0571 (La.4/1/11), 61 So.3d 507, 555; Ferrell v. Fireman’s Fund Insurance Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
The delays resulting from the utilities conflicts were addressed by several witnesses at trial. Steve Strickland, Sullivan’s project estimator and construction manager, testified about his preparation of a construction schedule for the project in connection with the preparation of Sullivan’s bid. He testified that RCS began the drainage work, but the planned construction sequence was soon disrupted due to conflicts with utility lines located in the construction area and not shown on the City’s construction plans. Strickland also reviewed the City’s work day reports that identified working days and nonworking-days. He confirmed that those records identified 49 dates during the first seven months of the construction when work on the project was suspended due to utilities conflicts. The subsequent’ work day reports did not identify any more lost days due to utilities conflicts; however, | inStrickland testified that he was familiar with additional'utilities delays, although he did not specify when those delays occurred or their duration. He thought the subsequent work day reports by the City were inaccurate and did not sign them.
Jesse Spence, Sullivan’s junior project manager at the time of the project, confirmed that undisclosed utility lines delayed the construction project. He noted utilities conflicts and delays still occurring as late as 2003; however, like Strickland, Spence did not testify as to any specific dates when construction was suspended or the duration of any such suspension. Spence disagreed with the City’s documentation in the work day reports and diaries and believed that Sullivan was charged for work days when utilities conflicts prevented them from working, while on other days the City noted that weather prevented work when, in fact, utilities prevented work. However, Sullivan submitted no documentation of its own to reflect a more accurate number of work days lost due to utilities conflicts.
Roland Alonso, president and sole owner of RCS, described problematic delays in completing the installation of the drainage system due to utility lines that had not been removed and were not shown on the plans. As late as February of 2003, almost two years after the commencement of construction, RCS was still hitting utility lines that were not disclosed on the plans. Sullivan offered into evidence numerous letters written by Alonso or Strickland to the City’s project engineer regarding the utilities conflicts; however, Alonso also failed to identify any specific dates when his company’s work had to stop due to the conflicts and the duration of the delays.
The City offered a discovery deposition of the City, taken pursuant to Louisiana Code of Civil Procedure article 1442, that consisted of testimony from several City employees involved in the project. The City employees conceded that hnconflicts with unidentified utilities caused delays in the project, but they contended that most of the project delays were due to a lack of cooperation from RCS.
The City also offered excerpts from the discovery deposition of Stephen Spohrer, an engineer retained by the City with experience in construction management and cost scheduling. Spohrer believed that Sullivan’s original estimate of the project *201 duration was unrealistic based upon Sullivan’s history with similar jobs. According to Spohrer, a job of this nature would normally take Sullivan 22 to 28 months to complete, and the total duration of this project fell within that range. He believed that this project was a normal, typical job for Sullivan and that the surprises they encountered were not unusual for a job of this character in an urban environment.
Sullivan, as the party seeking to recover damages under the contract, bore the burden of proving its entitlement to idle equipment charges.in accordance with the terms and conditions of the DOTD directive in the contract documents. See La.Civ.Code arts. 1995, 2005; L & A Contracting Company, Inc. v. Ram Industrial Coatings, Inc., 99-0854 (La.App. 1 Cir. 6/23/00), 762 So.2d 1223, 1235, writ denied, 00-2232 (La.11/13/00), 775 So.2d 438. The DOTD directive sets forth a precise formula for determining the idle equipment expenses that requires proof of what equipment was rendered idle by utilities conflicts and the duration of the idle period. Because equipment is periodically delivered to and removed from the project site, the identification of equipment rendered idle by a compensable delay requires proof of the actual dates the project was suspended due to utilities conflicts. Otherwise, it is impossible to determine what equipment was rendered idle by a compensable delay.
While Sullivan criticizes the City for failing to document the specific days delayed due to utilities conflicts, noting that the City’s documentation of the utilities conflicts delays stopped after 49 such days were documented, it is Sullivan l2iwho is claiming damages in this case. Those damages are based upon a specific damage provision of Sullivan’s contract with the City. Consequently, it is Sullivan’s burden of proof, not the City’s, to establish the delays which caused its damage. While claiming about a year of such delays, Sullivan apparently maintained no documentation for the purpose of establishing its claim; thus, the necessity for its expert to construct a formula to reconstruct the delays.
Although the testimony of the witnesses generally indicates periodic conflicts with utilities throughout the project, the only evidence of actual dates when utilities conflicts suspended the construction is contained in the City’s work day reports, which identify 49 such dates from April 16, 2001 through October 26, 2001. No other competent evidence identifies specific dates when work on the projected stopped and equipment was idle due to utilities conflicts. Accordingly, from the evidence presented, we are able to ascertain 49 specific days when the construction was suspended due to utilities conflicts.[10]
We next determine what equipment was on the project site during one or more of these 49 days. The City argues that Sullivan failed to prove when any equipment was on the construction site, because Sullivan did not maintain records confirming the first and last date that each item of equipment was on the site. Sullivan did document when it “charged” each piece of equipment to the project, meaning the days when a piece of equipment was used on the project. Spence reviewed Sullivan’s records and determined the first and last day each piece of equipment was charged on the project, and Myers used that information to define the period of time each piece of equipment was on the *202 project site for purposes of his calculations. Although Spence conceded that “theoretically” some of the equipment could have been moved off the job between charge dates, he stated that | a2it would be very uneconomical to do so. At Myers’s request, Sullivan personnel also reviewed records for some of the equipment to determine whether it was charged to any other projects during the delay period, and no billings for the equipment were found for other projects.
In an action to recover damages for breach of contract, a plaintiff must prove his case by a preponderance of the evidence, either direct or circumstantial. See Guidry v. Statewide Trailer Sales & Lafourche Concrete, Inc., 393 So.2d 144, 145 (La.App. 1 Cir.1980). Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not. Hanks, 944 So.2d at 578; Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 664 (La.1989). A fact established by direct evidence is one which has been testified to by witnesses as having come under the cognizance of their senses. Hanks, 944 So.2d at 578; Cangelosi, 564 So.2d at 664. Circumstantial evidence, on the other hand, is evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred. Hanks, 944 So.2d at 578-579; Cangelosi, 564 So.2d at 664-665.
Considering the entirety of the evidence, both direct and circumstantial, we find that Sullivan sufficiently proved the dates that each item of equipment was on the project site. Based upon our de novo review of the evidence, 54 items of equipment were on the project site during one or more of the 49 utilities-conflict days and are eligible for idle time reimbursement, all as more specifically set forth on the Addendum attached hereto.[11]
The remaining information necessary to calculate the idle equipment expense for each of the 54 items of equipment is a reimbursement rate. .We are |^persuaded that Myers determined appropriate monthly reimbursement rates for the equipment by using the Blue Book monthly rate. His testimony and supporting exhibits confirm that for each piece of equipment, he utilized the applicable Blue Book rate, made adjustments for the equipment age and project region, and arrived at a monthly rate. In accordance with the formula set form in the DOTD directive, we reduce that monthly rate by half and divide the figure by 176 hours to arrive at an hourly reimbursement rate, which we then convert to a daily rate based on an 8-hour work-day. For each of 54 items of equipment identified on the Addendum, we have multiplied its daily reimbursement rate by the number of days it was on the site when the construction was suspended. As itemized in the Addendum and in accordance with the formula agreed upon by the parties, we award total idle equipment reimbursement expense in favor of Sullivan and against the City in the amount of $124,741.64.
We next consider Sullivan’s claim for additional overhead expenses attributable to delays from utilities conflicts. Overhead or indirect expenses consists generally of the expenses of a business enterprise for salaries of executives, central office staff personnel, rent, communications, vehicles, utilities, interest *203 on borrowed capital and numerous other expenses which are necessary for the operation of the business, but which are not directly attributable to a particular construction job or project. See McCarty Corporation v. Industrial Scaffolding, Inc., 413 So.2d 1322, 1324 (La.App. 1 Cir. 1981). Since it is practically impossible to accurately allocate the exact amount of indirect expense actually incurred on each job or project, the generally accepted practice is to determine what the proportionate amount of all indirect expenses is to the dollar volume of work performed or business done by the company, and then allocate these overhead or indirect expenses to each job or project. McCarty, 413 So.2d at 1324. Overhead or indirect expenses are a true cost of doing business; therefore, it is ^customary to award overhead expenses in both actions of breach of contract and tort actions to cover indirect expenses that are not reflected in a direct expense incurred in remedying the damage sustained, and such expenses need not be proved item by item. See McCarty, 413 So.2d at 1324.
Myers calculated a daily amount of overhead expense attributable to the Tiger Bend project based upon the length of the project and the percentage of Sullivan’s total revenue derived from the project. That daily amount, according to Myers, was $591.14, which he then multiplied by 303 days to arrive at the sum of $179,115.42. The trial court awarded $62,690.40 for this claim.
The City does not contest Sullivan’s right to recover additional overhead expenses caused by any delays from utilities conflicts, but the City does contend that the 303-day figure utilized by Myers to calculate the award was improper because that figure includes weekends, holidays and weather, days. The City essentially argues that the compensable delay for additional overhead expense should be limited to actual work days only.
Initially, we note that while the calculation of idle equipment charges requires specific proof of when the delays occurred in order to identify what equipment was on site during the delay, the determination of the additional overhead expenses, as calculated by Myers, does not require such specificity because the overhead expense is distributed pro rata over the entire duration of the project. Myers only needed to determine the total duration of the utilities- conflict delays, which he then multiplied by his daily overhead rate to arrive at the additional overhead expense. As to the duration of the delay, Myers acknowledged that his 303-day figure consisted of calendar days, as opposed to work days, and included weekends, weather days, and holidays. However, his calculation of the additional overhead amount used a daily rate derived from the total overhead expense allocated to the project divided by the total number of calendar days (822) | gfjin the project. Thus in determining the daily rate, Myers spread the overhead expense over calendar days, not just work days, which yielded a lower daily rate than if the overhead had been divided only by work days. His use of calendar days to determine a reduced daily rate appears to warrant the use of calendar days to determine the second factor in the calculation, the duration of the delay.[12]
*204 However, more importantly, the trial court did not accept Myers’s proposed figure of $179,115.42 for the additional overhead expenses. Instead, the court awarded only $62,690.40. Based upon the entirety of the evidence, we cannot say that award is an abuse of discretion. The evidence indicates that the delays from utilities conflicts may have been as long as 303 days (Myers’s opinion), as short as 49 days (the City’s work day reports), or somewhere in between those two extremes. Myers’s opinion was not only contradicted by the City’s documentation but was also contradicted by his own construction summary that indicated ongoing work during the period of his delay. On the other hand, the City’s documentation of only 49 days of delay caused by utilities conflicts, with the final day occurring in October of 2001, is contradicted by the testimony of multiple witnesses who confirmed continued problems with the conflicts as late as 2003.
In reviewing an award of additional overhead expenses, this court has recognized that “it is practically impossible to accurately allocate the exact amount of’ indirect expense or overhead actually incurred on a job and that “such expenses need not be proved item by item.” See McCarty, 413 So.2d at 1324. Likewise, when damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La. Civ. Code art. 1999; L & A Contracting Company, Inc. v. Ram Industrial Coatings, Inc., 99-0354 (La.App. 1 Cir. 6/23/00), 762 So.2d 1223, 1235, writ denied, 00-2232 (La.11/13/00), 775 So.2d 438. Absent an abuse of discretion, an appellate court will not disturb a trial court’s assessment of damages. L & A Contracting Company, Inc., 762 So.2d at 1235. Considering all of the evidence in the present case, the trial court reasonably could have determined that the recoverable delay was more than 49 days but less than 303 days, and the trial court’s award is consistent with a recoverable delay that falls within the range of those two extremes. Accordingly, we find no abuse of discretion or manifest error in the award of $62,690.40 for Sullivan’s additional overhead expenses.[13]

Sullivan’s Appeal: Recovery of RCS’s Alleged Damages

Sullivan also appealed the judgment and contends that the trial court erred in failing to award the alleged additional expenses and damages that its subcontractor, RCS, incurred as a result of the errors in the City’s contract documents. RCS’s owner, Alonso, testified that the company was owed $209,238.00 for additional work, idle equipment costs, and overhead expenses resulting from the utilities conflicts. Citing Keller Construction Corporation v. George W. McCoy & Co., Inc., 239 La. 522, 557-58, 119 So.2d 450, *205 463 (1960), Sullivan argues that as the general contractor, it has the right to recover these damages claimed by its subcontractor.
In Keller, a developer contracted with a general contractor (Keller) to complete a project that involved the construction of a sewer system. Keller then entered an agreement with a subcontractor (McCoy) for that work. When the 127system developed leaks, McCoy made several repairs; however, the system continued to develop leaks. The matter proceeded to litigation involving all three parties, with Keller suing McCoy based on allegations of faulty work by the subcontractor, McCoy reconvening against Keller for the costs of McCoy’s repair work based on allegations that the leaks were not due to any fault of McCoy, and Keller filing a third-party demand against the developer seeking reimbursement for any liability Keller may have to McCoy if the developer’s plans were defective. Keller, 239 La. at 534-535, 119 So.2d at 454-455. The trial court rendered a judgment in favor of Keller against McCoy; however, on appeal, the supreme court found that the leaks were due to deficiencies in the developer’s plans and specifications. Keller, 239 La. at 536, 556, 119 So.2d at 456, 463. Because the leaks were not due to any fault of McCoy, the supreme court held that McCoy was entitled to recover the cost of the repair work from Keller, who, in turn, was entitled to recover that amount from the developer, the.party ultimately responsible for the defective plans which caused the leaks. Keller, 239 La. at 556-558, 119 So.2d at 463.
The facts of Keller are distinguishable from the present case because RCS is not a party to this suit and has not filed any claim against Sullivan. In contrast to Keller, Sullivan was not cast in judgment to RCS for any expenses or damages incurred by RCS, and Sullivan is not seeking to be reimbursed any liability judicially imposed upon it.
Sullivan also cites Farrell Construction Company v. Jefferson Parish, Louisiana, 896 F.2d 136, 141 (5th Cir.1990), which addressed whether a subcontractor was an indispensable party in a suit filed against an owner by a general contractor on its own behalf and “for the account of’ a subcontractor. Farrell, 896 F.2d at 138-139. The subcontractor, whose presence in the suit would have defeated diversity jurisdiction, entered a “prelitigation agreement” IgjWith the general contractor whereby the parties agreed that the general contractor would file “one consolidated action” against the owner and that the parties would “fully cooperate with each other in the prosecution of the claims.” Farrell, 896 F.2d at 138. The Fifth Circuit held that the subcontractor was not an indispensable party because it did not have any substantive rights, contractual or otherwise, that were enforceable against the owner. Farrell, 896 F.2d at 140-141. In dicta, the court further stated that the general contractor’s claim “on behalf of [the subcontractor] is authorized by the civil law” because “[i]n Louisiana ... the prime contractor may assert against the owner as an element of its own damages the damages of the subcontractor attributable to the owner’s defective plans and specifications.” Farrell, 896 F.2d at 141. The court cited Keller as authority for that statement.
We do not construe Keller as authorizing a general contractor to file suit “on behalf of a subcontractor to recover the subcontractor’s damages caused by the owner’s fault.” Keller permitted a general contractor, who was judicially declared liable to the subcontractor for expenses it incurred due to faulty plans, to recover those sums from the owner as part of the general contractor’s damages. Under *206 those circumstances, the general contractor sustained damages, in the form of judicially-imposed liability to its subcontractor, caused by the owner’s breach of warranty for its plans and specifications. To the extent Fair ell construed Keller otherwise, we disagree.[14]
| aflRCS is not a party to this litigation and has no claim pending against Sullivan. Sullivan’s liability, if any, to RCS for idle equipment charges, overhead, and additional expenses arising out of the undisclosed utility lines has not been judicially imposed and is not otherwise established by the evidence. Spence, Sullivan’s representative, testified that Sullivan was only obligated to pay the claim if and when the City paid the amounts to Sullivan. An incomplete copy of the subcontract was introduced into evidence, and the provisions in evidence do not set forth any obligation by Sullivan to pay RCS’s idle equipment charges, nor does the subcontract incorporate the City’s contract documents, except to provide that the “Subcontractor shall be bound” by the documents insofar as applicable to RCS’s work. The subcontract does not vest RCS with the right to enforce any remedies provided in those documents, such as the idle equipment charges, against Sullivan. The trial court did not err in denying Sullivan’s claim seeking to recover damages allegedly sustained by RCS. This assignment of error has no merit.
CONCLUSION
The November 27, 2013 judgment, as amended on March 5, 2014, is amended, in part, to set forth a total award in favor of Sullivan of $187,432.04, consisting of $124,741.64 in idle equipment expenses and $62,690.40 in additional overhead expenses. As amended the judgment is affirmed. Costs of this appeal in the amount of $5,252.50 are assessed one-half to F.G. Sullivan, Jr., Contractor, and one-half to the City of Baton Rouge and Parish of East Baton Rouge.
AMENDED AND AFFIRMED AS AMENDED.
[[Image here]]
*207 [[Image here]]
*208 [[Image here]]
McDONALD, J., concurs and assigns reasons.

. We note that the sum of the trial court's itemized amounts is $951,736.37, which is $6,000.00 less than its original award of $957,736.37. In opposing the City’s motion for new trial, Sullivan suggested that the trial court intended to award $895,045.99 for the idle equipment charges 35% of the gross amount calculated by Sullivan’s expert witness, which, when added to the overhead award, would result in a total award of $957,736.39 (two cents higher than the original judgment amount). The trial court signed an amended judgment for the revised total.

. This court has previously used Louisiana Code of Evidence article 804's definition of "unavailable” to determine whether a deponent was unavailable for purposes of Louisiana Code of Civil Procedure article 1450 A(3)(a). See Walley v. Vargas, 12-0022 (La.App. 1 Cir. 9/21/12), 104 So.3d 93, 99-100.

. We recognize that any such communications would require Daigle’s authorization pursuant to the Health Insurance Portability and Accountability Act at 42 U.S.C.A. § I320d et seq. See also 45 C.F.R. § 164.508.

. See also Trascher v. Territo, 11-2093 (La.5/8/12), 89 So.3d 357, 362 ("A party may not complain on appeal about an evidentiary ruling unless the trial judge was given the opportunity to avoid the perceived error, and the ruling 'affected' a ‘substantial right’ of the party.”)

. In two related arguments, the City also, asserted, again for the first time on appeal, that Daigle’s deposition was admissible under Article 1450 A(5), which permits the use of a deposition of an expert at trial unless, in pertinent part, the opposing party objects. Because Sullivan objected to the introduction of Daigle’s deposition, Article-1450 A(5) is not applicable. The City also cited Estate of Anderson v. Charity Hospital of Louisiana at New Orleans, 537 So.2d 1218 (La.App. 4 Cir.), writ denied, 539 So.2d 633 (La.1989), for the general proposition that "courts in Louisiana have recognized the need to use expert depositions in lieu of live testimony, especially when there is such a vast expanse of time in between when the deposition is taken and the trial occurs, such as the case here.” We find no support for this statement in Estate of Anderson, which upheld the introduction of a perpetuation deposition of an expert who had been available for multiple prior trial settings but was not available for the final trial setting. Estate of Anderson, 537 So.2d at 1218. That holding offers no support for the City’s assignment of error.

. Pursuant to a provision in the contract documents addressed hereinafter, Myers reduced his gross damage figure for idle equipment charges by 50% to arrive at a net, recoverable amount. The trial court reduced Myers's gross figure by 65%, meaning the court applied an additional 15% discount to Myers’s figure to arrive at the amount of the award for idle equipment charges.

. Although the DOTD directive provides an hourly reimbursement rate that is determined by dividing the monthly rate by 176, Myers used a daily rate that he calculated by dividing the monthly rate by 30.4 days.

. The 50% reduction was applied in accordance with the provision in the DOTD Directive that the reimbursement rate shall not exceed one-half of the Blue Book rate. Rather than use one-half of the Blue Book rate, Myers used the full rate and calculated a gross amount for all "idle” equipment, which he then reduced by 50% to account for the one-half limitation on the Blue Book rate.

. Those 49 days, all in 2001, are as follows: April 16, 17, 18, 19, 20; May 14, 15, 16, 17, 23. 31; June 1. 4. 5. 13. 14. 15. 18. 19. 20. 22. 28, 29; July 9, 10, 11, 12, 13, 16, 19, 20, 23, 25; August 6, 21, 22; and October 3, 4, 8, 9, 16. 17. 18. 19. 22. 23. 24. 25. 26.

. The identified equipment includes trucks and a mobile concrete plant moved to the location. We reject the City’s arguments that these items of equipment should not be included in the calculation of the idle equipment charges.

. Myers offered a similar explanation for his calculation of the idle equipment expenses. According to Myers, his use of calendar-days yielded essentially the same result as a workday delay calculation because he converted the Blue Book monthly rate to a daily rate by dividing the monthly figure by 30.4 days, which is the average number of calendar days in a month. The DOTD directive called for dividing the monthly figure by 176 hours, *204 which if converted to a daily rate, is the equivalent of only 22 days (based on an 8 hour work day). Thus, Myers’s higher number of days (calendar versus work day) was offset by a lower daily rate.

. We note that de novo review of the award of additional overhead expenses is not warranted by the trial court's error in determining the award for the separate claim for idle equipment expenses. The lower court's error in relying upon Myers's opinion to determine when the delays occurred was not material to the claim for additional overhead expenses, because that claim did not require specific proof of when the delays occurred. Consequently, the trial court's error in determining the award for idle equipment expenses was not material to the overhead expense claim and did not interdict the fact-finding process for that award. Cf. Roberts v. Rudzis, 13-0538 (La.App. 1 Cir. 5/28/14), 146 So.3d 602, 608, writ denied, 14-1369 (La.10/3/14), 149 So.3d 797.

. In a similar argument, Sullivan also cites jurisprudence from federal courts and other states for the premise that a general contractor should be allowed to recover extra costs and services wrongfully demanded under the contract, regardless of whether the contractor performed the work itself or through a subcontractor. Sometimes referred to as the "pass-through doctrine,” this theory of recovery allows a general contractor to bring an action for the subcontractor’s damages; however, as in Keller, the general contractor must be liable to the subcontractor for those damages. See Interstate Contracting Corporation v. City of Dallas, 135 S.W.3d 605, 611 (Tex.2004). For that reason, the cited jurisprudence is not applicable to the present case.